Melnick, J.
*1282 ¶ 1 The State alleged that on May 1, 2015, Alexander Kitt, Jermohnn Gore, Clifford Krentkowski, and three other men initiated a retaliatory drive-by shooting at a rival gang's territory in Tacoma. Law enforcement officers concluded their gunfire struck and killed Brandon Morris, who was unaffiliated with the rival gang but happened to be in the area. Kitt, Gore, and Krentkowski were jointly tried and convicted of murder in the first degree and four counts of assault in the first degree. In addition, Kitt and Gore were convicted of unlawful possession of a firearm in the first degree, and Gore was convicted of intimidating a witness for threats he made before the trial.
¶ 2 In the published portion of this opinion, we reverse Krentkowski's conviction because his trial counsel had an actual conflict of interest that affected the representation, and the trial court erred by not allowing him to withdraw. In the unpublished portion of this opinion, we affirm the majority of Kitt's and Gore's convictions, but remand for the trial court to dismiss their murder in the second degree convictions with prejudice, conduct a Miller[1] hearing for Gore, and strike specific legal financial obligations (LFOs) for Kitt and Gore.
FACTS[2]
I. INCIDENT [3]
¶ 3 Kitt, Gore, and Krentkowski were all members of the Hilltop Crips street gang.
¶ 4 In the weeks before May 1, LeShaun Alexander, a member of the Knoccout Crips street gang, shot at some members of the Hilltop Crips, including Krentkowski. On the morning of May 1, Alexander shot at Kitt in the Tacoma Hilltop area outside the home of Trevion Tucker, another Hilltop Crips member.
¶ 5 A few minutes after the shooting, Gore called Tucker's house and said he intended to go look for the shooters. A group gathered in a white Cadillac Escalade, driven by fellow Hilltop Crips member Lance Milton-Ausley. The group included Milton-Ausley, Kitt, Gore, Krentkowski, and Tucker.
¶ 6 Kitt brought a backpack that contained two handguns. He kept one and gave the other to Gore. Kitt said he wanted to shoot Alexander. Krentkowski had an AK-47 semiautomatic assault rifle. The group planned to shoot at a convenience store, known as the "red store," in Knoccout territory where Knoccout members were known to gather. They planned to park somewhere near the store, get out, and shoot at it. They also planned to take pictures of themselves in Knoccout territory and post them on social media as a sign of disrespect to the rival gang.
¶ 7 As the group approached the red store, they noticed Alexander's car parked nearby. Milton-Ausley drove into the alley beside the red store. Alexander and several other Knoccout members were in a group near the store.
¶ 8 As soon as they pulled into the alley, Gore and Kitt began shooting in the direction of the store. Each of them fired one of Kitt's handguns. During the shooting, Milton-Ausley drove slowly down the alley. He accelerated away when the shooting subsided. Krentkowski had the assault rifle on his lap but did not shoot. Tucker testified that no one was aiming and none of them saw anyone get shot; they were "just shooting at the store." 14 Report of Proceedings (RP) at 2600.
¶ 9 That same day, Morris and four companions were walking in the alley behind the red store. A bullet fired from the Escalade struck Morris in the head and he died several days later. Another bullet struck a backpack worn by one of Morris's companions, but it did not injure him. None of the Knoccout members near the store was injured.
*1283 ¶ 10 At the time of the shooting, Kitt was 23 years old, Gore was 16 years old, and Krentkowski was 17 years old.
¶ 11 The State charged Kitt, Gore, and Krentkowski each with one count of murder in the first degree and one count of murder in the second degree for the death of Morris. It also charged each of them with four counts of assault in the first degree, one for each of Morris's companions. It charged Kitt and Gore with unlawful possession of a firearm in the first degree and Gore with intimidating a witness. The case proceeded to a jury trial.
II. CONFLICT OF INTEREST
¶ 12 At the start of trial, Walter Peale, Krentkowski's lawyer, informed the court about a conflict of interest. He stated that he had represented Alexander in an unrelated case, in which the court had granted Peale's motion to withdraw based on his representation of Krentkowski. Peale argued that Krentkowski should be advised about the conflict by an independent counsel before the case could proceed.
¶ 13 The State argued that there was no actual conflict because Alexander was not involved in the case other than that his "name may come up." 1 RP at 10. It explained that it would not be calling Alexander as a witness, but that the facts involved back-and-forth shootings between the Hilltop Crips and the Knoccout Crips and that Alexander was a "principal[ ] on the Knoccoutz side." 1 RP at 10.
¶ 14 The court ruled that no conflict existed that required withdrawal. It stated that, "[i]f they're totally unrelated matters, the representation of either Mr. Krentkowski or Mr. Alexander is not directly adverse to the other client." 1 RP at 31. The court recognized that a conflict would exist if there was "a significant risk that the representation of one or more clients will be materially limited by a lawyer's responsibility to another client, a former client or a third person or by a personal interest of the lawyer," but stated that it would "be surprised that a criminal defense attorney would have such a conflict" and that, even in that case, the rule allowed representation "in certain circumstances." 1 RP at 31-32. The court said Peale could raise the issue again with additional citation to authority.
¶ 15 Several days later, Peale brought a motion to delay jury selection so that he could withdraw and Krentkowski could be appointed a new attorney or represent himself. Peale's motion raised his lack of preparation, his difficulties with the case, and the conflict of interest. The court denied the motion and stated that it had already ruled on Peale's motion to withdraw and substitute counsel. The court engaged in a colloquy with Krentkowski regarding self-representation. After conferring with Peale, Krentkowski withdrew his request to represent himself.
¶ 16 Peale raised the conflict of interest issue again the following day, after an independent counsel had reviewed the situation and opined that Peale had a conflict. The court stated that it had ruled on the issue and again denied Peale's motion to withdraw.
¶ 17 During its opening statement, the State told the jury that the evidence would show that Alexander had shot at Gore and Krentkowski a few days before the red store shooting. Peale then argued that the State had made Alexander a part of the case, "creat[ing] a relationship that [was] entirely different" from how the conflict had previously been explained. 4 RP at 710. He argued that his client was alleged to be the victim of his former client and that a central part of the State's case placed his clients at odds with one another, creating a "much greater risk of violating a variety of rules of professional responsibility." 4 RP at 711. Peale moved for a mistrial. The court denied Peale's mistrial motion and again denied his motion to withdraw.
¶ 18 During witness testimony, Peale raised the issue of his alleged conflict of interest two additional times. The first time, during Milton-Ausley's testimony, he stated that the case would require him to ask,
[W]hat was in the mind of Mr. Alexander? What was his reputation? What was his character? What do I know about him that would offer up an explanation in defense of Mr. Krentkowski? And why am I not pursuing that? And the reason I can't pursue it is because he's a former client.
*1284 8 RP at 1471. Peale argued that if evidence about Krentkowski and Alexander's interactions came in, he would be unable to respond due to his conflict of interest. The court delayed ruling until Peale had a chance to interview Tucker about his planned testimony.
¶ 19 After interviewing Tucker, Peale learned that Tucker intended to testify that Alexander was armed and present at the red store shooting and may have fired at Krentkowski. Peale suggested that the court exclude evidence of Alexander's involvement so he could continue representing Krentkowski despite the conflict. He argued that, otherwise, Tucker's testimony would "raise[ ] a considerable amount of information about [his] former client that in defense of [his] present client may be relevant to explore which [he couldn't] explore," preventing him from presenting a defense. 13 RP at 2372. The court denied Peale's motion.
¶ 20 At the conclusion of the trial, the jury returned guilty verdicts as to each count against all three defendants and found that each defendant was armed with a firearm during the commission of each murder and assault offense. The defendants appeal.
ANALYSIS
¶ 21 Krentkowski contends that he received ineffective assistance of counsel because the trial court denied his trial counsel's motion to withdraw based on a conflict of interest. He argues that, because an actual conflict of interest existed, we should presume prejudice and reverse his conviction. We agree.
¶ 22 The Sixth Amendment to the United States Constitution and article I, section 22 of the Washington State Constitution guarantee the right to effective assistance of counsel. Strickland v. Washington , 466 U.S. 668, 685-86, 104 S. Ct. 2052, 80 L. Ed. 2d. 674 (1984) ; State v. Grier , 171 Wash.2d 17, 32, 246 P.3d 1260 (2011).
¶ 23 We review claims of ineffective assistance of counsel de novo. State v. Sutherby , 165 Wash.2d 870, 883, 204 P.3d 916 (2009). To prevail on a claim of ineffective assistance of counsel, the defendant must show both (1) that defense counsel's representation was deficient, and (2) that the deficient representation prejudiced the defendant. Grier , 171 Wash.2d at 32-33, 246 P.3d 1260 ; State v. Linville , 191 Wash.2d 513, 524, 423 P.3d 842 (2018). Representation is deficient if, after considering all the circumstances, the performance falls " 'below an objective standard of reasonableness.' " Grier , 171 Wash.2d at 33, 246 P.3d 1260 (quoting Strickland , 466 U.S. at 688, 104 S.Ct. 2052 ).
¶ 24 Effective assistance of counsel includes a duty of loyalty and a duty to avoid conflicts of interest. State v. McDonald , 143 Wash.2d 506, 511, 22 P.3d 791 (2001). To establish a Sixth Amendment violation based on a conflict of interest, "a defendant must demonstrate that an actual conflict of interest adversely affected his lawyer's performance." State v. Regan , 143 Wash. App. 419, 427, 177 P.3d 783 (2008). This requires the defendant to show "both that his attorney had a conflict of interest and that the conflict adversely affected counsel's performance." State v. Reeder , 181 Wash. App. 897, 909, 330 P.3d 786 (2014). If the defendant meets this two-part test, prejudice is presumed. Reeder , 181 Wash. App. at 909, 330 P.3d 786.
¶ 25 To show that the conflict adversely affected his lawyer's performance, the defendant must show that the conflict either " 'cause[d] some lapse in representation contrary to the defendant's interests,' " or " 'likely' affected particular aspects of counsel's advocacy on behalf of the defendant." Regan , 143 Wash. App. at 428, 177 P.3d 783 (quoting State v. Robinson , 79 Wash. App. 386, 395, 902 P.2d 652 (1995) and United States v. Miskinis , 966 F.2d 1263, 1268 (9th Cir. 1992) ). "[T]he possibility of a conflict [is] not enough to warrant reversal of a conviction." State v. Dhaliwal , 150 Wash.2d 559, 573, 79 P.3d 432 (2003).
¶ 26 We review a trial court's decision on a motion to substitute counsel for an abuse of discretion. Reeder , 181 Wash. App. at 908, 330 P.3d 786. However, whether the circumstances demonstrate a conflict under ethical rules is a question of law we review de novo. Regan , 143 Wash. App. at 428, 177 P.3d 783.
*1285 ¶ 27 "An actual conflict of interest exists when a defense attorney owes duties to a party whose interests are adverse to those of the defendant." State v. White , 80 Wash. App. 406, 411-12, 907 P.2d 310 (1995). The matters alleged to be in conflict must be "substantially related." State v. MacDonald , 122 Wash. App. 804, 813, 95 P.3d 1248 (2004).
¶ 28 RPC 1.7(a) provides that a concurrent conflict of interest exists if "the representation of one client will be directly adverse to another client" or "there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer." RPC 1.9(c) prohibits a lawyer who has formerly represented a client from "us[ing] information relating to the representation to the disadvantage of the former client" except as the ethical rules would permit or require.
¶ 29 To determine whether an actual conflict exists, the trial court should perform a three-prong factual inquiry:
"First, the court reconstructs the scope of the facts involved in the former representation and projects the scope of the facts that will be involved in the second representation. Second, the court assumes that the lawyer obtained confidential client information about all facts within the scope of the former representation. Third, the court then determines whether any factual matter in the former representation is so similar to any material factual matter in the latter representation that a lawyer would consider it useful in advancing the interests of the client in the latter representation."
MacDonald , 122 Wash. App. at 813, 95 P.3d 1248 (quoting State v. Hunsaker , 74 Wash. App. 38, 44, 873 P.2d 540 (1994) ).
¶ 30 In White , the defendant's lawyer had been appointed to represent a codefendant earlier in the case. 80 Wash. App. at 408-09, 907 P.2d 310. He reviewed the first client's file and police reports and recommended to the first client's relative that the first client should consider a guilty plea, but he never met with the first client. White , 80 Wash. App. at 408-09, 907 P.2d 310. Eleven days after his appointment, the lawyer was replaced. White , 80 Wash. App. at 409, 907 P.2d 310. Two weeks later, the court appointed the lawyer to represent White. White , 80 Wash. App. at 409, 907 P.2d 310. Neither party raised the conflict issue until after trial, when the lawyer noted in an affidavit that the police report from White's case had "seemed familiar" but he had not realized he had represented two codefendants until after it was brought to his attention. White , 80 Wash. App. at 409, 907 P.2d 310.
¶ 31 White concluded that the attorney had not " 'actively' represented conflicting interests" because he "never directly communicated with [the codefendant]" and was not "privy to any confidences that could create an active conflict of interest." 80 Wash. App. at 412, 907 P.2d 310. There was "nothing in the record to support White's allegation that Appointed Counsel's allegiance to him was impaired." White , 80 Wash. App. at 412, 907 P.2d 310.
¶ 32 In MacDonald , the trial court disqualified the defendant's chosen defense lawyer because of a conflict of interest. 122 Wash. App. at 812, 95 P.3d 1248. The disqualified lawyer had represented the victim's mother in an unrelated marital dissolution case. MacDonald , 122 Wash. App. at 812, 95 P.3d 1248. Although the matters were completely unrelated, the court assumed the lawyer had received confidential information about the victim in the course of representing her mother. MacDonald , 122 Wash. App. at 813-14, 95 P.3d 1248. This information "was relevant to [the victim's] credibility and, potentially, her current rape accusation." MacDonald , 122 Wash. App. at 814, 95 P.3d 1248. Because the marital dissolution action "would have necessitated receiving information about" the victim, and her testimony was "the sole evidence against" the defendant, a conflict existed and the lawyer could not represent the defendant. MacDonald , 122 Wash. App. at 814, 95 P.3d 1248.
¶ 33 In Dhaliwal , the defendant's lawyer had represented several witnesses who testified at trial. 150 Wash.2d at 564, 79 P.3d 432. The representation of the witnesses occurred both prior to and during the defendant's *1286 case. Dhaliwal , 150 Wash.2d at 564-65, 79 P.3d 432. The trial court asked the lawyer about his representation of the witnesses and the lawyer said there was no conflict. Dhaliwal , 150 Wash.2d at 565, 79 P.3d 432. Dhaliwal never objected and he said he wanted the lawyer to continue representing him. Dhaliwal , 150 Wash.2d at 565, 79 P.3d 432. The other representation involved a shareholder action which may have been related to the motive for the murder at issue in the case. Dhaliwal , 150 Wash.2d at 572, 79 P.3d 432.
¶ 34 Dhaliwal focused on the lawyer's actual performance at trial and concluded that Dhaliwal showed "the possibility that his attorney was representing conflicting interests," but "failed to establish an actual conflict because he ha[d] not shown how [his lawyer's] concurrent representation of the witnesses ... affected [his] performance at trial." 150 Wash.2d at 573, 79 P.3d 432. Dhaliwal did not show a "strong possibility that a conflict of interest had an effect on [his lawyer's] performance." Dhaliwal , 150 Wash.2d at 574, 79 P.3d 432.
¶ 35 In this case, Peale repeatedly raised a conflict of interest based on his representation of a rival gang member. Trial testimony established that Alexander had shot at Kitt the morning of the shooting and had shot at Krentkowski a few weeks prior. Alexander was one of the intended targets of the red store shooting. Peale said that the State's case raised a considerable amount of information about Alexander that may be relevant to his defense of Krentkowski, but that he could not explore this information because of his ongoing duty to Alexander.
¶ 36 We accept Peale's representations that he learned confidential information in his representation of Alexander that he could not use to defend Krentkowski. Although Peale no longer represented Alexander at the time of trial, RPC 1.9(c)(1) prohibited him from using any confidential information he had obtained in his representation of Krentkowski. Peale raised numerous issues that could have been helpful to his defense of Krentkowski that he could not explore due to his ongoing duty to Alexander, such as Alexander's reputation and character and his relationship to Krentkowski. He was unable to pursue a defense relying on this information because Alexander was his former client.
¶ 37 This case bears similarities to Dhaliwal , where the attorney represented numerous witnesses in the case. However, unlike in Dhaliwal , Peale raised the conflict numerous times before the trial court, repeatedly claiming that an actual conflict existed. Additionally, an independent counsel spoke with Krentkowski and concluded that Peale had a conflict of interest.
¶ 38 Peale had an actual conflict of interest that affected his defense of Krentkowski. He repeatedly informed the trial court of this conflict and stated that the conflict would limit his representation of Krentkowski throughout the trial. We conclude that Krentkowski received ineffective assistance of counsel. In so ruling, we are mindful that the lawyer made numerous motions to withdraw due to the conflict, and the court denied all of them. Although Krentkowski couches his argument as ineffective assistance of counsel, the true error is in the court's failure to grant the motions to withdraw. We reverse Krentkowski's convictions.
¶ 39 A majority of the panel having determined that only the foregoing portion of this opinion will be printed in the Washington Appellate Reports and that the remainder shall be filed for public record pursuant to RCW 2.06.040, it is so ordered.
We concur:
Worswick, P.J.
Sutton, J.

Miller v. Alabama , 567 U.S. 460, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012).

The following facts provide some background information and relate to the published portion of this opinion. Additional relevant facts will be related in the unpublished portion.

Witnesses related the following events at trial.