**NOTICE:  SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

FILE

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
MARCH 3, 2022

_Gonzáles C.J._
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
MARCH 3, 2022

ERIN L. LENNON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

|  |  |  |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 99546-0 |
| Respondent, | ) | |
| | ) | |
| v. | ) | En Banc |
| | ) | |
| DANIEL ETHAN ELWELL, | ) | |
| | ) | Filed: March 3, 2022 |
| Petitioner. | ) | |
| | ) | |

YU, J. — This case concerns the open view doctrine and the right to counsel in a criminal case. Petitioner Daniel Ethan Elwell was charged with one count of residential burglary. He disagreed with his assigned trial counsel about a number of issues, including the probable merit of a motion to suppress based on an alleged unlawful search. Elwell ultimately filed a written motion to suppress the stolen item, although counsel assisted by eliciting testimony and presenting oral argument before the court.

The trial court denied Elwell's motion to suppress, and he was convicted. The Court of Appeals affirmed, holding that Elwell's motion to suppress was

properly denied on the basis of the open view doctrine and that Elwell's right to counsel had not been violated. We affirm in result.

The open view doctrine does not justify the police officer's actions in this case. Instead, we hold that the officer engaged in an unlawful, warrantless search in violation of article I, section 7 of the Washington Constitution. Therefore, it was error to deny Elwell's motion to suppress. However, the error was harmless. We further hold that Elwell was not deprived of the right to counsel. Thus, we affirm his conviction.

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

### A.     Factual background

On the morning of March 7, 2018, the manager of a Seattle apartment complex near the University of Washington discovered that a large, arcade-style video game (specifically, Pac-Man) was missing from the game room. Overnight surveillance footage showed a person entering at about 4 a.m. and leaving at about 5:30 a.m. with the Pac-Man machine, a cardboard box, and a wheeled dolly. The manager recognized the box and the dolly as belonging to the apartment complex. She did not recognize the person, and they did "not have permission to enter or take any items." Clerk's Papers (CP) at 5.

The apartment manager called the police, who responded at about 1 p.m. Officers spoke to the manager, watched the surveillance footage, and then went

2

back to their duties. The officers did not have any particular suspects but thought that "the person could still be potentially in the area," so they were "keeping an eye out." Verbatim Report of Proceedings (VRP) (Oct. 31, 2018) at 193.

At about 2:20 p.m., the officers were driving near the apartment complex when they saw Elwell on the sidewalk and stopped to question him. The officers "immediately recognized" Elwell from the apartment complex's surveillance footage based on his clothing, his face, and a "large item that he was wheeling around" that "appeared to be roughly the same size" as the Pac-Man machine. *Id.* at 194-95. However, the object was covered by a red, opaque blanket.

One of the officers asked Elwell, "There wouldn't happen to be a Pacman machine in there; would there be?" *Id.* at 199. Elwell replied, "I don't think so" and "I found it in the garbage." *Id.* The officer told Elwell that he matched "the exact description of somebody that burglarized the building the other day and took the Pacman machine," and the officer asked Elwell to "show us what's underneath there." *Id.* at 199-200. Elwell stated, "Everything I get is out of the garbage" and stepped back from the object slightly. *Id.* at 200; Ex. 6, at 1 min., 25 sec. (officer's body cam video).

The officer reached out and "unwrapped the blanket and a plastic bag that was on top of the box" to reveal a Pac-Man machine on a dolly, which the apartment manager later identified as the stolen machine. Suppl. CP at 337. It is

3

*State v. Elwell*, No. 99546-0

undisputed that Elwell "did not give his verbal consent to search." VRP (Oct. 31, 2018) at 203. Nevertheless, the officer testified he "did not feel that a warrant was required" because Elwell "exactly matched the person" from the surveillance footage and had with him "an item that's the exact same size as the one that was stolen before." *Id.* at 209-10.

B.      Procedural history

On March 12, 2018, Elwell was charged with one count of residential burglary. His trial counsel was assigned in or around June but suffered a concussion in September. As a result, trial counsel informed the court that he was "not fit to go to trial" and requested a continuance. Status Hr'g (Sept. 17, 2018) at 3. Elwell did not object but made it clear that he would object if further continuances were requested. Trial was set for October 15.

On October 10, Elwell's counsel moved for another continuance due to his injury. Elwell objected to the delay and requested a new attorney if assigned counsel had become incapacitated. The court cautioned that a new attorney could cause yet more delays but nevertheless set a hearing on Elwell's motion to substitute counsel. The court also granted trial counsel's request for a continuance.

At the motion hearing, trial counsel explained that he and Elwell had several areas of disagreement, including the nature of the charge, Elwell's offender score, whether to bring a motion to suppress, and whether to go to trial. Elwell added

4

that he was concerned by the delays, by his difficulty contacting counsel, and by counsel's recent concussion. The court denied the motion to substitute counsel, explaining that trial counsel's role was not to agree with Elwell but to give him legal advice. Counsel also confirmed that his health had improved and that his concussion would not hinder his effective representation of Elwell.

In his brief, trial counsel advised the court that Elwell wanted to bring a motion to suppress on the theory that by removing the blanket and ripping off the plastic wrapping that were covering the Pac-Man machine, police conducted an unlawful search. However, counsel did not think such a challenge was "viable." CP at 14. Because the facts appeared undisputed and because the same facts formed the basis of both Elwell's motion to suppress and the State's case in chief, trial counsel suggested that the court could decide the motion to suppress after the evidence was presented by the State in front of the jury. Counsel reasoned that if the motion to suppress were granted, then the jury could be instructed to disregard the relevant testimony.

The trial court granted Elwell permission to bring his motion to suppress pro se, despite trial counsel's doubts as to its merit, and agreed to decide the motion to suppress after the State presented its evidence.

In addition to the motion to suppress, trial counsel informed the court that Elwell was still interested in a new attorney and was still concerned about

*State v. Elwell*, No. 99546-0

counsel's concussion. Counsel informed the court that he had recovered completely, and the court noted that counsel was performing to the same standard that the court had observed in prior cases. The court also reiterated that "an attorney has an independent, ethical obligation to make arguments that he or she thinks are supported by the law even if the client doesn't, you know, see eye to eye with them about that." VRP (Oct. 29, 2018) at 30. The court did not appoint new counsel.

Elwell filed his own written motion to suppress pursuant to CrR 3.6 and requested substitute counsel to represent him on the motion. As planned, the court did not consider the motion to suppress before the State began presenting its case in chief. After one of the officers testified for the State, the jury was excused so the officer could be questioned on issues relating to the motion to suppress. At Elwell's request, trial counsel asked questions on Elwell's behalf, eliciting testimony that the officer could not remember if he saw "the dolly beneath the blanket," that "Elwell never expressly gave . . . permission to look under the red covering," and that the officers could have secured the object while they sought a warrant. VRP (Oct. 31, 2018) at 209-10. The jury then returned, and the State resumed its case in chief.

After the State rested, the jury was excused and the parties argued the motion to suppress. Elwell consented to trial counsel making the arguments on his

6

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

behalf. Counsel contended that by covering the item and "keeping it from public view," Elwell had exerted control over the object and brought it within the scope of his right to privacy. *Id.* at 223. Counsel also pointed out that the officer had no warrant or consent and that there were no exigent circumstances. The State countered that both Elwell and the object with him were immediately recognizable from the surveillance footage, so Elwell had no right to privacy in the object, regardless of the plastic wrapping and the blanket covering it. The court denied the motion to suppress, ruling that "[t]here was no right to privacy in the object being rolled down the street, because its nature was so apparent." Suppl. CP at 337.

After conferring with trial counsel, Elwell decided not to testify. The jury then returned, and both sides made closing arguments. Elwell was convicted.

On November 16, trial counsel filed a motion to withdraw so that substitute counsel could file a motion for a new trial based on ineffective assistance. Elwell was assigned substitute counsel, but the motion for a new trial was denied, and the court moved on to sentencing. The State recommended a standard range sentence of 70 months, while Elwell requested a drug offender sentencing alternative (DOSA). The court imposed a 70-month sentence.

Elwell appealed, represented by new counsel. Appellate counsel raised issues concerning the right to counsel, the motion to suppress, and lesser-included offense instructions. Elwell filed a statement of additional grounds for review

*State v. Elwell*, No. 99546-0

concerning the denial of a DOSA. *See* RAP 10.10. The Court of Appeals affirmed in a unanimous, unpublished opinion. *State v. Elwell*, No. 79738-7-I (Feb. 1, 2021) (unpublished), https://www.courts.wa.gov/opinions/pdf/797387.pdf. We granted Elwell's petition for review.

## ISSUES

A.     Was it reversible error to deny Elwell's motion to suppress?

B.     Was Elwell deprived of the right to counsel when the trial court allowed him to bring his own motion to suppress?

C.     Was Elwell deprived of the right to conflict-free counsel?

D.     Was trial counsel ineffective?

## ANALYSIS

A.     The motion to suppress should have been granted, but the error was harmless

The closest issue presented is whether the trial court properly denied Elwell's motion to suppress. The resolution of this issue depends on whether the open view doctrine applies. The trial court and the Court of Appeals determined that it did. Suppl. CP at 337; *Elwell*, No. 79738-7-I, slip op. at 4. The findings of fact are unchallenged in this case, and our "[r]eview of conclusions of law entered by the trial court at a suppression hearing is de novo." *State v. Carter*, 151 Wn.2d 118, 125, 85 P.3d 887 (2004). We hold that the open view doctrine does not apply and that Elwell's motion to suppress should have been granted. Nevertheless,

8

reversal is not required because the State has met its burden of showing that the error was harmless.

      1.     Background on the open view doctrine

The open view doctrine applies to both the Fourth Amendment to the United States Constitution and article I, section 7 of the Washington Constitution.[1] *Id.* at 126-27. It provides that "[t]he mere observation of that which is there to be seen does not necessarily constitute a search." *State v. Seagull*, 95 Wn.2d 898, 901, 632 P.2d 44 (1981). This is because "[g]enerally, one does not have a privacy interest in what is voluntarily exposed to the public." *Carter*, 151 Wn.2d at 126. Therefore,

> [u]nder the open view doctrine, if an officer detects something by using one or more of [their] senses, while lawfully present at the vantage point where those senses are used, no search has occurred . . . [and the] officer has the same license to intrude as a reasonably respectful citizen.

---

[1] Elwell asserts that the open view doctrine is "narrower . . . under the more protective article I, section 7 standard." Pet. for Review at 10. He may be correct that the state and federal open view doctrines differ in some way. *Compare Washington v. Chrisman*, 455 U.S. 1, 6, 102 S. Ct. 812, 70 L. Ed. 2d 778 (1982) ("disagree[ing] with this [court's] novel reading of the Fourth Amendment"), *with State v. Chrisman*, 100 Wn.2d 814, 819, 676 P.2d 419 (1984) ("look[ing] to state law to define the elements of 'plain view'"). However, for an independent state law analysis, "it is not sufficient for parties to simply 'mention our state constitution in their briefs' and note that article I, section 7 is often more protective than the Fourth Amendment." *State v. Mayfield*, 192 Wn.2d 871, 881, 895, 434 P.3d 58 (2019) (quoting *State v. Rojo Armenta*, 134 Wn.2d 1, 10 n.7, 948 P.2d 1280 (1997)). Elwell does not explain how the state open view doctrine differs from the federal open view doctrine as applied to this case. Therefore, we decline to engage in an independent state law analysis here. We do not foreclose the possibility of such an analysis in a future case with sufficient briefing.

*State v. Elwell*, No. 99546-0

*State v. Cardenas*, 146 Wn.2d 400, 408, 47 P.3d 127 (2002).

The open view doctrine is "visually similar, but legally distinct" from the plain view doctrine. *Seagull*, 95 Wn.2d at 901. "Whereas a 'plain view' situation involves an officer viewing an item after a lawful intrusion into a constitutionally protected area, 'open view' involves an observation from a nonconstitutionally protected area." *State v. Kennedy*, 107 Wn.2d 1, 10, 726 P.2d 445 (1986) (emphasis omitted) (citing *Seagull*, 95 Wn.2d at 901-02). Nevertheless, the open view and plain view doctrines are similar because they both permit police to effect a warrantless seizure if it is "immediately apparent" that the object police seize "is associated with a crime." *State v. Morgan*, 193 Wn.2d 365, 372, 440 P.3d 136 (2019). Here, the Court of Appeals correctly determined that "the open view doctrine may apply, and the plain view doctrine does not," because the officer observed Elwell with the blanket-covered object on "a public street." *Elwell*, No. 79738-7-I, slip op. at 5.

> 2. The Pac-Man machine was not in open view, so removing the blanket and the plastic wrapping was a search

The State's position is that the open view doctrine applies, that the officer did not intrude on a "private affair[ ]" by lifting the blanket and ripping off the plastic wrapping, and, therefore, that "there was no search." WASH. CONST. art. I, § 7; Suppl. Br. of Resp't at 4. Elwell's position is that there was a search because it "was not immediately apparent" that the covered object "was the Pac-Man

10

*State v. Elwell*, No. 99546-0

machine until [the officer] unwrapped the red blanket, removed the plastic wrapping, and moved several objects from the top of the box." Pet. for Review at 10-11. Elwell is correct that in removing the Pac-Man machine's covering, the officer conducted an unlawful search. However, we take this opportunity to clarify our precedent regarding the "immediately apparent" inquiry.

In order to seize an object pursuant to the open view doctrine, the object must, of course, be in "view." In other words, an officer must be able to detect the object without "manipulat[ing]" it, solely "by using one or more of [their] senses." *Morgan*, 193 Wn.2d at 372 & n.6; *Cardenas*, 146 Wn.2d at 408. Here, the officer used his senses to observe Elwell on a public sidewalk with a large, covered object.

The officer reasonably inferred that the object was the stolen Pac-Man machine. This reasonable inference might have established probable cause to support a search warrant or even to conduct a warrantless arrest. But we need not (and expressly do not) decide whether the officer could have taken such actions because he did not. Instead, the officer removed the blanket and the plastic wrapping covering the object, confirming his suspicion that the covered object was the Pac-Man machine. The Pac-Man machine was not in view (or otherwise detectable through the senses) until its covering was removed. Therefore, removing the covering was a search.

11

*State v. Elwell*, No. 99546-0

Probable cause, without more, does not provide the necessary "authority of law" to conduct a warrantless search in accordance with article I, section 7. Yet probable cause was all the officer in this case had; there was no warrant or consent, and no exception to the warrant requirement applies. Thus, Elwell's motion to suppress should have been granted.

3.     For the open view doctrine to apply, the *evidentiary value* of an object must be "immediately apparent," but the *identity* of the object must be unambiguous

The seemingly simple analysis above has been complicated here by an ambiguity in our precedent, which we now clarify. We recently held in *Morgan* that the plain view doctrine (and therefore, by analogy, the open view doctrine) permits a warrantless seizure where the police, in relevant part, "are immediately able to realize the evidence they see is associated with criminal activity." 193 Wn.2d at 371. We further explained that "[o]bjects are immediately apparent . . . 'when, considering the surrounding circumstances, the police can reasonably conclude' that the subject evidence is associated with a crime. Certainty is not necessary." *Id.* at 372 (citation omitted) (quoting *State v. Hudson*, 124 Wn.2d 107, 118, 874 P.2d 160 (1994)).

The parties in this case have understandably focused on the question of whether it was "immediately apparent" that the object Elwell had with him was the Pac-Man machine before the officer removed the blanket and plastic wrapping.

12

*State v. Elwell*, No. 99546-0

But that is not the relevant inquiry in this case. For the open view doctrine to apply, the *evidentiary value* of the object need not be certain, so long as it is "immediately apparent." By contrast, the *identity* of the object, as discussed below, must be unambiguous. In this case, the identity of the object was ambiguous before the officer removed its covering. Therefore, the open view doctrine cannot apply.

The "immediately apparent" language we used in *Morgan* was correct and fully consistent with precedent. *See, e.g., State v. Hatchie*, 161 Wn.2d 390, 395, 166 P.3d 698 (2007); *State v. Kull*, 155 Wn.2d 80, 85, 118 P.3d 307 (2005); *Hudson*, 124 Wn.2d at 114. However, the correct application of that language may have been misunderstood due to the unusual facts presented in *Morgan*. We therefore take this opportunity to clarify it.

The object at issue in *Morgan* was "clothing in 'several plastic shopping like bags.'" 193 Wn.2d at 368. Although the bags were not transparent, the officer "did not have to manipulate the bags to know what they contained," and "[n]othing in this record suggest[ed] any ambiguity; it [was] clear from context that the plastic hospital bags contained the clothing hospital staff removed in treating Morgan." *Id.* at 372; *cf. State v. Courcy*, 48 Wn. App. 326, 327, 739 P.2d 98 (1987) (cocaine in "a blue and black precisely folded paper 'bindle'"). Thus, despite its opaque covering, the *identity* of the object in *Morgan* was unambiguous.

13

*State v. Elwell*, No. 99546-0

However, for the plain view doctrine to apply, it was not sufficient for the State to show that the object in the bag was unambiguously Morgan's clothing because a suspect's clothing does not automatically have evidentiary value. Instead, for the plain view doctrine to apply, we required a further showing that the police were "aware of the *evidentiary value* of Morgan's clothing." *Morgan*, 193 Wn.2d at 372 (emphasis added). The State made such a showing because, in part, the officers knew that Morgan's clothing had "smelled like gasoline" before it was put in the bag, and the crimes at issue included arson. *Id.* The gasoline smell did not establish the clothing's evidentiary value with "[c]ertainty," but it did make the clothing's evidentiary value "immediately apparent." *Id.*

Returning to Elwell's case, it is undisputed that the Pac-Man machine was not literally an "exposed object" because it was covered by an opaque blanket. *State v. Myers*, 117 Wn.2d 332, 345, 815 P.2d 761 (1991). Moreover, it is clear that the covered object's identity was not unambiguous, as it was in *Morgan*. Unlike the police in *Morgan*, the officer in this case did manipulate the object before seizing it by removing the blanket and the plastic wrapping covering it. This would not have been necessary if the object's identity was unambiguous. And although it was highly likely that the object was the Pac-Man machine, in fact, the visible object was simply a large, generic, rectangular box covered by a blanket. It could have contained anything or nothing.

14

*State v. Elwell*, No. 99546-0

In addition, the officer requested Elwell's consent to remove the covering multiple times before doing so himself without Elwell's permission. These were not the actions of "a reasonably respectful citizen" who is merely observing something "voluntarily exposed to the public." *Cardenas*, 146 Wn.2d at 408; *Carter*, 151 Wn.2d at 126. Removing the blanket and the plastic wrapping to reveal what was beneath it was a search.

Thus, for the open view doctrine to apply, there must be no ambiguity on the basic question of the identity of the object in question. In other words, the officer must be able to determine what the object is with certainty, without manipulating the object and using only their senses. In addition, the object's evidentiary value must be "immediately apparent," but that is a separate inquiry from the object's identity.

4.    The denial of the motion to suppress was harmless error

Although the motion to suppress should have been granted, we nevertheless affirm because the error was harmless. "To make this determination, we utilize the 'overwhelming untainted evidence' test. 'Under this test, we consider the untainted evidence admitted at trial to determine if it is so overwhelming that it necessarily leads to a finding of guilt.'" *State v. Thompson*, 151 Wn.2d 793, 808, 92 P.3d 228 (2004) (emphasis and citation omitted) (quoting *State v. Smith*, 148

15

*State v. Elwell*, No. 99546-0

Wn.2d 122, 139, 59 P.3d 74 (2002)). The State has made the necessary showing here.

As the Court of Appeals explained, "Even if the jury did not learn what was underneath the covering," the jury would still be able to consider the high-quality "security camera footage depicting Elwell committing the charged crime." *Elwell*, No. 79738-7-I, slip op. at 9. The jury would also have been able to watch most of the officer's body cam video clearly depicting Elwell in the same clothes, with the same facial hair, less than a mile from the burglary on the same day it occurred, wheeling along a large object matching the size and shape of the stolen Pac-Man machine. Ex. 6, at 0 min., 0 sec. to 1 min., 27 sec. "[A]ny reasonable trier of fact would have reached the same result despite the error." *Thompson*, 151 Wn.2d at 808.

Thus, we hold the denial of the motion to suppress was harmless error and turn to Elwell's claims regarding the right to assistance of counsel.

B.     Elwell was not deprived of the right to counsel at a critical stage

The first of Elwell's three right-to-counsel claims is that the trial court "deprived Mr. Elwell of his right to representation by counsel when it required him to proceed pro se on his motion to suppress."[2] Pet. for Review at 13. As Elwell

---

[2] Elwell cites both the state and federal constitutions but does not differentiate between them. Suppl. Br. of Pet'r at 4 (citing U.S. CONST. amends. VI, XIV; WASH. CONST. art. I, § 22). We therefore decline to engage in an independent analysis of state law.

correctly notes, "[l]eaving a person unrepresented at a critical stage requires reversal without consideration of prejudice." Suppl. Br. of Pet'r at 16 (citing *United States v. Cronic*, 466 U.S. 648, 659, 104 S. Ct. 2039, 80 L. Ed. 2d 657 (1984); *State v. Heddrick*, 166 Wn.2d 898, 910, 215 P.3d 201 (2009)). However, Elwell was never "unrepresented at a critical stage."

Elwell's claim is that he did not waive his right to counsel for the suppression motion and that "[r]equiring a person to proceed pro se in order to litigate an issue is '[a]n outright denial of the right to counsel.'" *Id.* at 15 (second alteration in original) (quoting *State v. Harell*, 80 Wn. App. 802, 805, 911 P.2d 1034 (1996)). This claim assumes that (1) Elwell had a constitutional right to counsel who would file the motion to suppress and (2) Elwell pursued his motion to suppress without the assistance of counsel. The first assumption is not supported by the law, and the second assumption is not supported by the record.

The right to counsel in a criminal case does not include the right to have counsel raise every issue the defendant wants to raise. In an attorney-client relationship, "[g]enerally, the client decides the goals of litigation and whether to exercise some specific constitutional rights, and the attorney determines the means." *State v. Cross*, 156 Wn.2d 580, 606, 132 P.3d 80 (2006), *abrogated on other grounds by State v. Gregory*, 192 Wn.2d 1, 427 P.3d 621 (2018). Therefore, "[i]n a criminal case, the lawyer shall abide by the client's decision, after

17

consultation with the lawyer, as to a plea to be entered, whether to waive jury trial and whether the client will testify." RPC 1.2(a). There is no dispute that Elwell made each of those decisions himself.

However, when it comes to "details of strategy," those matters "are generally for counsel to decide, not the client." *Cross*, 156 Wn.2d at 606. Thus, as the trial court correctly ruled, it was up to trial counsel to decide whether to bring the motion to suppress based on his professional judgment. Elwell's disagreement with trial counsel on the suppression motion did not automatically entitle him to a new attorney.

Our precedent sets forth the correct analysis where a defendant requests substitute counsel based on a disagreement about strategy. The request "must be timely and stated unequivocally." *Id.* at 607. In ruling on such a request, the trial court must decide whether "the 'relationship between lawyer and client completely collapse[d].'" *Id.* at 606 (quoting *In re Pers. Restraint of Stenson*, 142 Wn.2d 710, 722, 16 P.3d 1 (2001)). When we review the trial court's ruling, "we consider '(1) the extent of the conflict, (2) the adequacy of the [trial court's] inquiry, and (3) the timeliness of the motion.'" *Id.* at 607 (alteration in original) (quoting *Stenson*, 142 Wn.2d at 724). "We generally review trial court decisions relating to attorney/client differences for abuse of discretion." *Id.*

*State v. Elwell*, No. 99546-0

Elwell does not go through this analysis. Instead, he relies on *State v. Harell* for the proposition that "[r]equiring a person to proceed pro se in order to litigate an issue is '[a]n outright denial of the right to counsel.'" Suppl. Br. of Pet'r at 15 (second alteration in original) (quoting *Harell*, 80 Wn. App. at 805). That is not what *Harell* holds.

The defendant in *Harell* "sought to withdraw his pleas, alleging ineffective assistance of counsel during the plea stage. The court granted a hearing on the motion to withdraw. At the hearing defense counsel declined to assist Harell . . . and defense counsel testified as a witness for the State." 80 Wn. App. at 803. Harell had no other counsel to assist him, and "the trial court denied Harell's motion to withdraw his guilty pleas." *Id.* The Court of Appeals determined that "Harell was denied his right to counsel at the hearing, and is entitled to a new hearing." *Id.* at 805.

There are clear legal and factual differences between the situation in *Harell* and the situation here. *Harell* dealt with a decision to plead guilty, which ultimately belongs to the client, not counsel. *Harell* also dealt with a claim of ineffective assistance, in which the attorney's interests are likely to be (and in that case, actually were) adverse to the client's. By contrast, Elwell's case deals with a motion to suppress, which is a matter of strategy to be decided by counsel, not the client. A motion to suppress is not inherently likely to cause the attorney's

19

interests to be adverse to the client's, and there is no indication that such a conflict actually occurred here.

This final point directly contradicts Elwell's claim that the trial court "forced Mr. Elwell to represent himself" on his motion to suppress. Suppl. Br. of Pet'r at 16. Unlike the attorney in *Harell*, who refused to assist his client and testified against him, Elwell's trial counsel actively assisted Elwell with his motion to suppress. At Elwell's request, counsel cross-examined the officer and argued for suppression in court. Thus, the State properly characterizes the situation as one in which Elwell "was *permitted* to raise an additional motion that his attorney declined to raise," and he did so with counsel's assistance. Suppl. Br. of Resp't at 11 (emphasis added).

The resulting arrangement, as the Court of Appeals correctly observed, was "properly allowed" as a form of "hybrid representation." *Elwell*, No. 79738-7-I, slip op. at 15. Elwell argues that he "did not request 'hybrid representation.'" Pet. for Review at 15. However, he fails to show that the trial court erred in denying the request he *did* make ("appoint counsel to represent Elwell on this motion"). CP at 60. By nevertheless allowing hybrid representation on the motion to suppress, the trial court gave Elwell a chance to bring the motion without requiring him to waive his right to counsel for the entire trial.

*State v. Elwell*, No. 99546-0

In some ways, this hybrid representation arrangement was comparable to a statement of additional grounds for review, which may be filed in the Court of Appeals pursuant to RAP 10.10. In both situations, a criminal defendant keeps their appointed counsel but also has the opportunity to "identify and discuss those matters . . . the defendant believes have not been adequately addressed by the brief filed by the defendant's counsel." RAP 10.10(a). For instance, in this case, Elwell filed a statement of additional grounds challenging the trial court's denial of a DOSA. Statement of Additional Grounds for Review, *State v. Elwell*, No. 79738-7-I (Wash. Ct. App. Jan. 23, 2020).

Elwell's appellate counsel did not raise the DOSA issue in her briefs. Yet Elwell does not contend that he was deprived of the right to counsel on appeal or that he was entitled to new appellate counsel who would brief the DOSA issue for him. It is not clear why the RAP 10.10 procedure was constitutionally permissible on appeal, but hybrid representation was constitutionally impermissible at trial, given that "[t]he right to counsel attaches at all critical stages of criminal proceedings—including the first appeal—under article I, section 22" of the state constitution. *State v. Rafay*, 167 Wn.2d 644, 652, 222 P.3d 86 (2009).

Thus, Elwell has not shown that he was deprived of his constitutional right to counsel at a critical stage of the proceedings. We affirm the Court of Appeals on this issue.

21

*State v. Elwell*, No. 99546-0

C.      Elwell was not deprived of the right to conflict-free counsel

Elwell also contends that trial counsel's "actions in actively advocating against Mr. Elwell and undermining his arguments created an actual conflict that left him 'not represented.'" Pet. for Review at 17 (quoting *State v. Chavez*, 162 Wn. App. 431, 439-40, 257 P.3d 1114 (2011)). It is true that "[t]he right to the effective assistance of counsel encompasses the right to representation 'free from conflicts of interest.'" Suppl. Br. of Pet'r at 5 (quoting *Wood v. Georgia*, 450 U.S. 261, 271, 101 S. Ct. 1097, 67 L. Ed. 2d 220 (1981)). But "[t]o establish a Sixth Amendment violation based on a conflict of interest, 'a defendant must demonstrate that an *actual conflict of interest* adversely affected his lawyer's performance.'" *State v. Kitt*, 9 Wn. App. 2d 235, 243, 442 P.3d 1280 (2019) (emphasis added) (quoting *State v. Regan*, 143 Wn. App. 419, 427, 177 P.3d 783 (2008)). As discussed above, "a conflict over strategy is not the same thing as a conflict of interest." *Cross*, 156 Wn.2d at 607.

A conflict over strategy *can* lead to an actual conflict of interest (and thus require appointment of new counsel) if it causes a "complete collapse" of the attorney-client relationship. *Id.* at 606. But Elwell does not claim that there was a complete collapse here, nor could he, given that his trial counsel conducted questioning and argument on the motion to suppress at Elwell's request. Instead, Elwell advocates for a bright line rule that a "lawyer abandons his client when he

22

*State v. Elwell*, No. 99546-0

refuses to make a potentially meritorious key motion that is consistent with defense objectives and requested by the client." Suppl. Br. of Pet'r at 8 (underlining omitted).

We decline to adopt such a rule, as it would "impair the independence of defense counsel" and eviscerate the "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Strickland v. Washington*, 466 U.S. 668, 690, 689, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). Therefore, as the Court of Appeals correctly recognized, trial counsel's failure to bring the suppression motion was, *at most*, ineffective assistance, not an actual conflict of interest. *Elwell*, No. 79738-7-I, slip op. at 14 n.8. We affirm the Court of Appeals on this issue.

D.      Elwell did not receive ineffective assistance of counsel

Finally, Elwell contends that trial counsel was ineffective because "[i]t is not a legitimate strategy or reasonable tactic to tell the court a motion is meritless."[3] Suppl. Br. of Pet'r at 17. However, counsel expressed his doubts about the merits of the motion to suppress in the context of ensuring that Elwell would be able to raise it. To avoid this (without lying to the court), counsel would have been required to file the motion to suppress even though he thought it was not viable.

---

[3] Elwell also asserts that trial counsel was ineffective based on "the failure to move to suppress the body camera footage of the search." Pet. for Review at 20. However, he does not explain why this was ineffective assistance, so we decline to consider it.

*State v. Elwell*, No. 99546-0

As discussed above, we decline to hold that counsel was required to bring Elwell's motion to suppress. Nevertheless, we agree with Elwell that trial counsel should have been a more forceful advocate on his behalf. Elwell's motion to suppress was meritorious, and counsel's suggestion that the court decide the motion to suppress after the evidence was presented to the jury was particularly questionable. Although the jury could have been instructed to disregard any suppressed evidence, it is better practice to prevent such evidence from being presented to the jury in the first place where possible, and there was no apparent strategic reason for doing otherwise in this case.

However, even if counsel's performance was "professionally unreasonable," and thus constitutionally deficient, Elwell cannot show prejudice, as he must for this court to reverse. *Strickland*, 466 U.S. at 691. As discussed above, the trial court's error in denying the motion to suppress was harmless. Therefore, assuming without deciding that counsel unreasonably failed to properly research and argue the suppression motion on Elwell's behalf, Elwell does not show that "there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695.

Thus, we affirm the Court of Appeals on this issue.

24

*State v. Elwell*, No. 99546-0

CONCLUSION

We hold that the open view doctrine does not apply, so Elwell's motion to

suppress should have been granted.  However, the error was harmless.  In addition,

Elwell has not shown any deprivation of his right to counsel.  We therefore affirm.

_____
Yu, J.

WE CONCUR:


_____
González, C.J.

_____
Stephens, J.

_____
Johnson, J.

_____


_____


_____
Montoya-Lewis, J.

_____
Owens, J.

_____
Whitener, J.

25

*State v. Elwell (Daniel E.)*

No. 99546-0

MADSEN, J. (concurring)—I agree with the majority that the trial court erred by denying the motion to suppress because the police officers here engaged in an unlawful, warrantless search. However, I disagree with the majority's attempt to extend the logic of another of our recent cases, *State v. Morgan*, 193 Wn.2d 365, 440 P.3d 136 (2019), to this case.[1] I believe that the *Morgan* court improperly applied the plain view exception. Accordingly, I do not believe *Morgan* can be harmonized with this case because it fails to protect the important constitutional rights at issue. I believe we should apply the plain view and open view exceptions only narrowly to situations where the evidence at issue is actually in plain or open view.

Article I, section 7 of the Washington Constitution provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." Our state constitution gives Washington residents greater protections than the Fourth Amendment to the United States Constitution. *State v. MacDicken*, 179 Wn.2d 936, 940,

---

[1] Although the open view and plain view doctrines apply in similar but legally distinct situations, they both permit police to perform a warrantless seizure if it is "immediately apparent" that the object seized "is associated with a crime." *Morgan*, 193 Wn.2d at 372. The main difference is that for open view, the object is outside and knowingly exposed to the public. *State v. Seagull*, 95 Wn.2d 898, 902, 632 P.2d 44 (1981). Because Elwell was outside on a public street when the officers approached him, we apply the open view doctrine here. However, the "immediately apparent" reasoning applies to both exceptions.

No. 99546-0
Madsen, J., concurring

319 P.3d 31 (2014); *State v. Young*, 123 Wn.2d 173, 179, 867 P.2d 593 (1994).

Generally, a police officer must obtain a warrant to perform a search unless it falls under one of the narrow exceptions set forth by our court. *State v. Hatchie*, 161 Wn.2d 390, 395, 166 P.3d 698 (2007) (noting warrantless searches are per se unreasonable under article 1, section 7 unless they fit under one of the "'jealously and carefully drawn exceptions'" (internal quotation marks omitted) (quoting *State v. Hendrickson*, 129 Wn.2d 61, 70, 917 P.2d 563 (1996))); *State v. Murray*, 84 Wn.2d 527, 533, 527 P.2d 1303 (1974) ("'The exceptions are "jealously and carefully drawn."'" (quoting *Coolidge v. New Hampshire*, 403 U.S. 443, 454, 91 S. Ct. 2022, 29 L. Ed. 2d 564 (1971) (plurality portion))). The open view and plain view exceptions are two of these exceptions. For either of these exceptions to apply, it must be immediately apparent to the seizing officer based on the facts and circumstances that the evidence they are *seeing* is incriminating. *Morgan*, 193 Wn.2d at 372.

In *Morgan*, a police officer entered the hospital room of the defendant. *Id*. at 368. Before arriving at the defendant's room, the officer was instructed to collect the defendant's clothes and interview the defendant. *Id*. While interviewing the defendant, the officer saw an opaque plastic shopping bag on the counter and took control of the bag. *Id*. At trial, the defendant unsuccessfully moved to suppress the contents of the seized bag, which were his clothing. *Id*. at 369. On appeal, this court held the warrantless seizure was permitted under the plain view doctrine because it was "immediately apparent" to the officer that the bag *could* reasonably contain evidence

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 99546-0
Madsen, J., concurring

associated with a crime. *Id*. at 372. The court concluded that based on the fact that the supervising officer believed the defendant's clothing had evidentiary value and instructed the seizing officer to collect the clothing, and on the seizing officer's observations, the evidentiary value of the bag was immediately apparent. *Id*. Thus, the court concluded that these circumstances were sufficient to satisfy the open view doctrine. *Id*.

However, the officer in *Morgan* did not *see* the evidence justifying a plain view seizure, just as the officers here did not *see* the gaming console in this case. *Id*. at 378 (Madsen, J., dissenting). In *Morgan*, the officer was instructed to gather the defendant's clothing, but the bag containing the clothes was opaque and the officer could only speculate that it contained the defendant's clothing. Further, he had no evidence that the clothing itself was actually incriminating evidence. *Id*. at 377. Similarly, the police in this case surmised the gaming console, which they knew was stolen, was the item covered by the blanket. Unlike *Morgan*, the majority here properly rejects application of the plain view exception to the warrant requirement.

The plain view and open view exceptions are straightforward and apply only when the object is actually in plain or open view. Our courts have rejected applying the plain view exception when the officer did not have immediately apparent knowledge that there was incriminating evidence before them. *See, e.g.*, *Murray*, 84 Wn.2d at 534 (holding the plain view exception did not apply when the officers tilted a television to read serial numbers that would prove the television was illegally acquired).

3

No. 99546-0
Madsen, J., concurring

Unlike Morgan, where the majority determined the officer's search was justified based on the surrounding circumstances, *Morgan*, 193 Wn.2d at 372, the majority here correctly requires the officer to have immediate, apparent knowledge that there was incriminating evidence before them. The majority in *Morgan* applied the exception too broadly.

The majority in this case attempts to distinguish the facts in this case from *Morgan*, arguing that here the object's identity was ambiguous and thus the *Morgan* rule should not apply. Majority at 14 ("It could have contained anything or nothing."). However the facts here are not unlike *Morgan*. In both cases, the evidence at issue was not easily discernible to the officer. The clothes in *Morgan* were covered by an opaque bag, and the Pac-Man machine here was covered by a blanket. In both cases, the officer could not immediately determine what the object was. Instead, the officers in both cases speculated as to the identity and evidentiary significance of what was hidden from view. Each of these cases demonstrate the danger of expanding these narrow exceptions into situations where the officer cannot actually know the objects are incriminating but instead uses context clues to justify the seizure. Allowing an officer to rely on context "clues" risks expanding the exception well beyond its intended goal and fails to protect constitutional rights.

I agree with the majority that the open view exception does not apply under the facts of this case but that the failure to grant the motion to suppress was harmless error.

4

No. 99546-0
Madsen, J., concurring

But, I cannot agree with the majority's attempt to harmonize this case with *Morgan*.

With these observations, I concur.

_____
Madsen, J.

_____
Gordon McCloud, J.

5