# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| STATE OF WASHINGTON, | No. 55171-3-II |
| Respondent, | |
| v. | |
| MATTHEW JEFFREY HOLT, | UNPUBLISHED OPINION |
| Appellant. | |

CRUSER, J. – Matthew Jeffrey Holt appeals his conspiracy to commit human trafficking, first degree human trafficking, second degree human trafficking, and promoting sexual abuse of a minor *Alford*[1] plea convictions and his sentence. He argues that (1) the trial court erred when it permitted him to appear in physical restraints at five pretrial proceedings without first conducting the necessary inquiry, (2) the trial court denied him his right to counsel at a hearing addressing his presentencing motion to withdraw his guilty plea, and (3) the trial court erred when it denied his request for an exceptional sentence below the standard range based on two statutory mitigating factors.

We hold that (1) the trial court either conducted the proper inquiry before allowing Holt to appear in restraints or that the single failure to conduct the inquiry was harmless beyond a

---

[1] *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970). Our Supreme Court adopted the *Alford* holding in *State v. Newton*, 87 Wn.2d 363, 552 P.2d 682 (1976).

reasonable doubt, (2) Holt was denied his right to counsel at the hearing on his motion to withdraw his guilty plea, and (3) the trial court did not fail to consider Holt's request for an exceptional sentence below the standard range based on two mitigating factors.

Accordingly, we affirm Holt's convictions and sentence. But we remand for a new hearing on Holt's motion to withdraw his guilty plea with the assistance of new counsel. We otherwise affirm.

FACTS

I. INVESTIGATION

In August 2016, a Lakewood Police Department officer was monitoring jail calls when he heard Holt,[2] who was then an inmate in the Nisqually Jail, discussing ongoing prostitution activity with others.[3] Copies of these calls were provided to the Federal Bureau of Investigations (FBI).

The FBI's South Sound Child Exploitation Task Force conducted a follow-up investigation, which included monitoring jail calls, gathering detailed information through victim interviews, verifying hotel records, and interviewing hotel staff. This investigation led to evidence that Holt, who was "the self-proclaimed leader of the Tillicum Park Gangsters street gang," and six "other males" identified as Tillicum Park Gangsters, "were prostituting young women, including minors." Clerk's Papers (CP) at 4. "The investigation in this case uncovered crimes committed by the codefendants including human trafficking, assault, rape, and/or promoting commercial exploitation of a minor." *Id.* at 5. It also revealed at least 15 victims.

---

[2] In his opening brief, Holt states that he is Black and Native American.

[3] These background facts are based on the State's declaration for determination of probable cause, which Holt agreed the trial court could rely on to establish a factual basis for the plea.

No. 55171-3-II

## II. CHARGES AND PRE-PLEA PROCEEDINGS

A. ORIGINAL CHARGES

On October 2, 2017, the State charged Holt with four counts: conspiracy to commit first degree human trafficking, first degree human trafficking, second degree human trafficking, and promoting commercial sexual abuse of a minor. The information stated that there were six codefendants in this matter.

B. ALTERCATION DURING AUGUST 10, 2018 HEARING

On August 10, 2018, Holt appeared for a trial readiness hearing before the Honorable Frank E. Cuthbertson. Holt and eight codefendants initially appeared at the hearing.

Immediately after the case was called, Holt, who was wearing arm restraints and a belly chain, assaulted one of his codefendants, Jamaal Pinkney, in the courtroom. Holt was "removed from the courtroom forcibly by several officers." State's Mot. to Take Judicial Notice, App. at 1 (Jan. 24, 2022). The court described the incident on the record and then invited the parties to supplement the record regarding the incident.

The prosecutor stated that the assault "appeared to be very violent and assaultive in nature" as well as "[u]nprovoked." *Id.* at 1-2. Pinkney's counsel stated that Pinkney had not provoked the attack. The court added that "[i]n addition to the assault, . . . there appeared to be a punch and [Holt] appeared to spit on Mr. Pinkney." *Id.* at 2.

The court then stated that it would proceed with the trial readiness hearing with the defendants who remained present. Several of the defendants moved for a continuance due to the ongoing discovery and the need to interview witnesses. Without Holt being present, his counsel requested a continuance over Holt's objection. The court found good cause for a continuance

3

because several counsel had stated that they still needed to interview witnesses and that there was ongoing discovery.

C. OCTOBER 2018 HEARING ON MOTION TO SUBSTITUTE COUNSEL

On October 19, 2018, the trial court, the Honorable Stephanie A. Arend presiding, heard a motion to substitute counsel by Holt.[4] The record does not mention or suggest that Holt was restrained in any manner during this hearing.

During this hearing, Holt advised the court that he wanted "to fire" his counsel due to "multiple conflicts of interest" and that he wanted new counsel. Verbatim Report of Proceedings (VRP) (Oct. 19, 2018) at 13-14. Holt asserted his counsel had not provided him with discovery; had refused to file a variety of motions; and was "corroborat[ing] with" jail staff to limit Holt's phone privileges, which impeded his ability to contact counsel. *Id.* at 21. Holt further stated that he "just fe[lt] like the loyalty isn't there" and that their communication was "broken and unamendable [sic]." *Id.* at 22.

Holt's counsel admitted that they had "some friction" and that they did not "always agree about how to proceed with handling the case." *Id.* at 23. But counsel asserted that these types of issues were common and that he had "no particular issue with that." *Id.* Counsel further stated that Holt was often unhappy if counsel would not agree to Holt's requests. But counsel denied any conflict of interest and or breakdown in communication on his part.

---

[4] This hearing had initially been noted as a hearing on a motion to proceed pro se, but at the hearing Holt argued that he wanted to substitute counsel instead.

After counsel discussed each of Holt's individual concerns, the court found no irreconcilable conflict or complete breakdown in communication and denied Holt's motion.[5]

D. NOVEMBER 19, 2018 HEARING ON MOTION TO SUBSTITUTE COUNSEL

On November 19, 2018, Holt again moved pro se to substitute counsel; Judge Arend also presided over this hearing. The record does not mention or suggest that Holt was restrained in any manner during this hearing.

Holt again argued that he wanted to remove counsel because of "a conflict." VRP (Nov. 19, 2018) at 51. He also asserted that court proceedings in this matter were being held outside of his presence and that his counsel had made racist comments. Counsel responded that Holt's assertion that he was not present at all court proceedings was "a lie" and denied making any racist statements. *Id.* at 52.

After counsel discussed each of the other claims that Holt had made, the trial court denied Holt's motion, noting that it believed that Holt's repeated motions to discharge counsel and obtain new counsel or proceed pro se were "merely for purposes of delay" and lacked any "legitimate basis." *Id.* at 53.

E. JANUARY 25, 2019 HEARING ON RESTRAINTS AND CONTINUANCES

On January 25, 2019, the trial court, the Honorable Elizabeth Martin presiding, held a hearing to address restraint issues and continuances. There were seven defendants, each with their own counsel, present at this hearing.

---

[5] The court also addressed issues related to counsel's appointment as stand-by counsel in a separate, unrelated firearm case. Those issues are not relevant to this appeal.

The State had moved for an order allowing the use of restraints on Holt. The State asserted that restraints were necessary because of (1) "the nature of the offense," noting that there was a "U[.]S[.] Marshall hold" and the case involved "human trafficking," (2) Holt's previous assaultive behavior, which occurred against "another inmate in court," (3) the "threat of harm to others," specifically threats of harm to staff and codefendants, (4) security concerns due to multiple defendants, and (5) "previous issues in court [with] co defendants." CP at 23. The State also advised the court that the jail had requested that Holt be restrained.

The State verified that the court was aware of Holt's history, noting that Holt had "had several [outbursts], including a physical altercation, an assault-type altercation" in the courtroom. VRP (Jan. 25, 2019) at 4. And the State commented that even if Holt's "attitude [was] good today," restraints were appropriate for everyone's security because he could "act[ ] out" without warning. *Id.*

Holt's counsel objected to the use of restraints. Counsel acknowledge that Holt may have "acted out in the past," but counsel contended that "of late, [Holt] has been very good and cooperative, and [counsel had] not heard anything that suggests he has [had] any recent outbursts either in jail or in court." *Id.* at 4-5.

The court acknowledged Holt's recent behavior, but it stated that it was also aware that the past incidents were "of a serious nature and unpredictable." *Id.* at 5. The court further stated, "I believed based on that and on his documented history of disruptive behavior in court and the threat of harm to himself or others, along with that assaultive behavior, it is appropriate to allow the jail to bring him in this hearing in restraints." *Id.* at 5.

Holt's counsel then requested that "the least restrictive restraints be used," rather than the "restraint chair" that the jail had proposed. *Id.* Counsel asked the State to "articulate what restraint they want to use under these circumstances," to "help narrow the argument." *Id.*

The State told the court that the type of restraint was the jail's issue. But it commented that Holt was in arm restraints and was wearing a belly chain when he assaulted Pinkney and that those restraints did not stop Holt from spitting on Pinkney. The court responded that based on that history, it would allow the restraint the jail had determined was appropriate in this case, including a restraint chair.

The court then addressed whether the other defendants could be restrained. The court emphasized that this was a pretrial hearing, that a jury would not be present, and that this hearing was not before the judge who would conduct the trial. The court considered the number of codefendants; the serious nature of the charges; the gang affiliations; and the presence of all of the codefendants in a small, constricted space. It concluded that these factors created security issues that justified the restraint of all of the defendants, other than Holt, by the least restrictive means possible to secure the courtroom.

After this ruling, Holt's counsel and Holt individually again objected to the use of the restraint chair and asked the court to reconsider the use of restraints. The court declined to reconsider its ruling at that time, in part because of the serious nature of the unexpected assault of Pinkney.

Other defendants then objected, arguing that the court had not made any individualized determinations as to them or had failed to consider the all of the required factors. The court refused to reconsider, reiterating that its decision was based on the small size of the courtroom, the large

7

number of defendants, and the security needs within the courtroom while all of the defendants were "within a close proximity." *Id.* at 28.

Holt then addressed court, and asked why the defendants were "being treated as though we are guilty before we are proven innocent." *Id.* at 29-30. He asserted that at his last five hearings he was unrestrained out of the chair, but with a belly chain, and that he did not have "any violent outbursts or actions." *Id.* at 30. Holt then accused the court of its decision being based on his "color and . . . race," and demanded that the court tell him if this was true or false. *Id.* The court responded, "I am not reconsidering for all of the factors that I articulated earlier. Thank you, Mr. Holt." *Id.*

The court then addressed the trial readiness issues and motions for a continuance. The court continued the trial date to August 19, 22 months after the State filed Holt's original charges. The court also signed an order allowing Holt to be restrained that included a finding that "[c]ompelling circumstances exist that some measure is needed to maintain security of the courtroom by restraining [Holt]." CP at 24.

F. FEBRUARY 7, 2019 HEARING ON MOTION TO SUBSTITUTE COUNSEL

During a February 7, 2019 hearing on yet another motion to substitute counsel before Judge Arend, the court commented that Holt had also requested that the court change Judge Martin's January 25, 2019 order authorizing the jail to restrain Holt. Holt's counsel asked the court to reconsider the restraints because "there were no problems last time" and Holt had no infractions since the last order. VRP (Feb. 7, 2019) at 3.

The State responded that "the jail is requesting that Mr. Holt be in restraints," and commented that Holt had "exhibited violent behavior in the court, including an assault on another in-custody person." *Id.* The State also asserted that Holt had "been a problem for this court since

he got here," noting that during his first hearing in this court, the court was unable to say anything because Holt was screaming at the court. *Id.* at 3-4. The State further asserted that it was difficult to predict what would "set Mr. Holt off," so restraints were necessary to restrict him if something happened to trigger him. *Id.* at 4. The court agreed with the State and stated that it would not change the prior order authorizing the use of restraints.

Holt then argued that he needed new counsel due to a conflict with his counsel, a breakdown in communication, and ineffective assistance of counsel. He asserted that counsel had not yet interviewed witnesses or investigated, that counsel had accused him (Holt) of yelling at him and had walked out of meetings or hung up on him, and that counsel had failed to file motions addressing issues related to the conditions of his confinement in the jail. Holt requested counsel "who [was] not overwhelmed with caseloads" and would be able to "fight effectively for his client and spend the necessary time" to accomplish his client's goals. *Id.* at 6.

Holt's counsel denied any conflict and stated that Holt simply did not like the answers he was getting from counsel. Counsel did admit to ending conversations if he had explained something to Holt six to eight times. He noted that Holt could be difficult to communicate with because he would not take counsel's advice and refused to accept what counsel was telling him. In regard to interviewing witnesses, counsel advised the court that discovery was voluminous and ongoing and that he had to prepare before conducting these interviews. In regard to the jail issues, counsel stated that he could not control what was happening in the jail in relation to jail security.

Holt replied that this motion and his other attempts to "fire counsel" were not attempts to delay proceedings. *Id.* at 12. And he asserted that the delay was caused by counsel and the State, who were violating his right to a speedy trial by seeking continuances.

The trial court considered the complexity of the case and the work done to date to prepare for the resolution of the case or trial. The court acknowledged the "extraordinary volume of discovery" and the length of time it would take to prepare. *Id.* at 13. The court also commented that it had not heard any evidence of a conflict of interest; that although communication could be difficult, such difficulty did not establish a breakdown in communication; and that counsel did have "limited authority with respect to the operations of the jail." *Id.* at 14. Additionally, the court noted that substitution of counsel at this point would only contribute to delay. The court then denied Holt's motion to substitute counsel.

G. JUNE 13, 2019 HEARING ON MOTION TO SUBSTITUTE COUNSEL

On June 13, 2019, Judge Arend presided over another hearing on a motion by Holt to proceed pro se. At the hearing, Holt advised the court he no longer wanted to proceed pro se because the State planned to bring additional charges if he did not plead guilty. Instead, he again asked to substitute counsel due to a conflict of interest.

This time, Holt asserted that his counsel was agreeing to file various motions in attempt to "placate" him and was not following through and that counsel was disclosing privileged information. *Id.* at 31. Holt also asserted that the court did not acknowledge the "bigotory [sic] comment" that he raised in a prior motion to substitute counsel. *Id.* at 34. Holt further asserted that he had not received all of the discovery and that counsel was prematurely conducting interviews without giving Holt the opportunity to advise counsel of any potential issues he might see in the discovery materials.

Counsel responded that he was in the process of filing some of the motions that Holt had requested, but counsel stated that some had no merit and he was not going to file them. Counsel

denied Holt's assertion that his caseload was interfering with his ability to represent Holt and denied any conflict of interest or disclosure of privileged information. And counsel stated that Holt's assertions that he "used racially charged words to insult him," were "entirely false." *Id.* at 39.

Counsel did admit to some delay in providing discovery to Holt, but he asserted it was due to redaction issues, and he stated that he had an investigator looking into this. Noting that any substitution of counsel would result in additional delay, counsel stated that he was still willing to represent Holt.

The court found no conflict and no ineffective assistance of counsel and denied the motion.

H. June 24, 2019 Hearing on Motion to Amend Charges, Bill of Particulars, and Bail

On June 24, 2019, the State filed an amended information. This information retained the four original charges and added seven additional charges: two more counts of first degree human trafficking; one count each of first, second, and third degree rape; one count of second degree assault; and one count of intimidating a witness.

That same day, a hearing was held to address the State's amended charges, Holt's request for a bill of particulars, and bail. Judge Cuthbertson, the same judge who had presided over the hearing in which Holt assaulted Pinkney, presided over this hearing.

During this hearing, the issue of restraints was briefly addressed. Holt's counsel stated that Holt "has been found to not always be required to be in chains," and argued that given the circumstances at this hearing, Holt should be unshackled. VRP (June 24, 2019) at 8. But the court deferred ruling on the restraint issue until after it recessed to consider whether it needed to recuse

11

based on the fact it was potentially a witness to any charges related to Holt's assault of Pinkney.

When the court returned from the recess, it recused itself and did not consider any other issues.[6]

### III. PLEA

On January 14, 2020, the State filed a second amended information, reinstating only the four original charges: conspiracy to commit first degree human trafficking, first degree human trafficking, second degree human trafficking, and promoting commercial sexual abuse of a minor. That same day, a change of plea hearing was held before Judge Arend.

Holt entered an *Alford* plea to the second amended information. Holt agreed that in lieu of making a statement, the court could review the declaration for determination of probable cause and "any other supplemental facts the State puts forward to the court, to establish a factual basis for the plea." CP at 57 (emphasis and boldface omitted).

The State agreed to recommend concurrent standard range sentences of 120 months on the conspiracy count, 360 months on the first degree human trafficking count, 286 months on the second degree human trafficking count, and 286 months on the promoting sexual abuse of a minor

---

[6] Holt filed additional motions claiming ineffective assistance of counsel and requesting new counsel on June 26, 2019, and July 3, 2019, raising substantially the same issues that the trial court addressed at the June 13, 2019 hearing. There is nothing in our record showing whether any hearings were held on these motions or whether the court decided these motions.

count.[7] The agreement allowed Holt to request an exceptional sentence. The court conducted a lengthy plea colloquy with Holt and accepted the plea.[8]

## IV. CRR 4.2(F) MOTION TO WITHDRAW PLEA

### A. WRITTEN MOTION TO WITHDRAW GUILTY PLEA

On February 21, 2020, Holt filed a pro se motion to withdraw his guilty plea. In his motion he alleged that his guilty plea was invalid due to numerous instances of ineffective assistance of counsel, his mental state at the time of the plea, inadequate time to review the plea agreement, and the State's alleged breach of the plea agreement. Holt alleged that at the time he entered his plea, he (1) "was unmedicated," "under sever[e] mental anguish suffering from mind altering cruel and unusual punishment d[ue] to the conditions placed on [him] by the courts," (2) was unable to call or write his counsel, and (3) his appointed counsel had failed to file motions he had promised to file. *Id.* at 63. Holt also claimed to have had only 5 to 10 minutes to review his plea agreement, and he asserted that this "points to" ineffective assistance of counsel. *Id.* Holt further asserted that his counsel did not review the plea agreement, that he was being forced to retain an attorney "who was violating [his] constitutional rights and [ineffectively] assisting [him]" in violation of his constitutional rights, and that this "forced [him] into a plea agreement." *Id.* at 64.

---

[7] The State agreed to also ask that these sentences be served concurrent to the sentence on a separate firearm charge.

[8] During the plea colloquy, the State and Holt also made a record of some additional agreements they had reached that were not part of the written plea agreement. These additional agreements related to whether the federal government could bring additional charges, a federal supervision or "hold" issue, the return of certain seized property, and the return of certain property being held by the jail. VRP (Jan. 14, 2020) at 88.

Holt also discussed some of the additional terms that the State had agreed to during the sentencing hearing and asserted that the State had failed to complete its obligations. Holt asserted that he had brought all of these issues to his counsel's attention and that counsel responded that he would address them after sentencing. But Holt argued that counsel knew this was a "lie" because counsel was aware that once Holt was sentenced counsel would be relieved of his duties to Holt. *Id.* at 65.

Holt asked that the court allow him to withdraw his guilty plea. In the alternative, he asked that if the court denied the motion to withdraw the plea that the court continue the sentencing hearing to allow the State to resolve any breaches before sentencing.

B. MOTION FOR COUNSEL TO WITHDRAW AND FOR SUBSTITUTE COUNSEL

At the start of the June 12, 2020 sentencing hearing before Judge Arend, Holt's counsel advised the court that Holt had instructed him to withdraw as counsel because Holt wanted to move forward with his motion to withdraw his plea, which was based, in part, on an ineffective assistance of counsel claim. Holt's counsel noted that the ineffective assistance of counsel claim created a conflict, so he had arranged for another attorney, who was present in the courtroom, to take over. Accordingly, counsel moved for the court to allow him to withdraw as counsel and for substitute counsel to step in.

After the parties and the court discussed whether Holt's motion to withdraw his guilty plea and Holt's counsel's motion to withdraw were related, the trial court concluded that the motion for counsel to withdraw and its accompanying ineffective assistance of counsel claim were "inextricably intertwined" with Holt's written motion to withdraw his plea. VRP (June 12, 2020)

at 9. Despite this, the trial court did not permit Holt's counsel to withdraw or appoint substitute counsel.

The State then asserted that because the issues related to the agreements the State made during the plea hearing had been resolved, there was no basis upon which Holt could withdraw his plea. Rather than respond to the State's argument, Holt's counsel again argued that representing Holt on the ineffective assistance of counsel arguments related to the motion to withdraw the plea created a conflict, so he should be permitted to withdraw. Holt then addressed the court, arguing that his counsel was now saying he could not represent him (Holt) based on a conflict of interest and that he had a right to substitute counsel.

The court again confirmed that the request for Holt's counsel to withdraw was related "to a potential motion to withdraw the guilty plea." *Id.* at 13. But rather than address that motion, the court discussed the details of the extensive change of plea proceedings. The court ultimately concluded that there was

> absolutely not a question in [the court's] mind that [Holt] absolutely understood everything that we went through, that you understood what [he was] looking at as a potential sentence, what the prosecutor agreed that the State was going to do as part of the agreement, and that [Holt's counsel], by all appearances from this Court, provided effective assistance of counsel, gave you all of the legal counsel and advice and opportunity for independent, private conversation and everything.

*Id.* at 15. But despite having thoroughly considered whether Holt's motion to withdraw his plea had merit, the court concluded, "*I don't think there is any basis* now, except to delay, for me to authorize the withdrawal of counsel or *for proceeding with a motion to withdraw on a guilty plea*." *Id.* (emphasis added).

15

V. SENTENCING

After denying Holt's motion to withdraw his guilty plea, the court proceeded to the sentencing phase of the hearing.

As it had agreed to in the plea agreement and argued in its sentencing memorandum, the State requested that the court sentence Holt to concurrent standard range sentences of 120 months on the conspiracy count, 360 months on the first degree human trafficking count, 286 months on the second degree human trafficking count, and 286 months on the promoting commercial sexual abuse of a minor count.[9] Holt requested that the court sentence him to mitigated sentences of 120 months on the conspiracy count, 218 months on the first degree human trafficking count, 142 months on the second degree human trafficking count, and 142 months on the promoting commercial sexual abuse of a minor count. [10]

Based on his sentencing memorandum, Holt's request for an exceptional mitigated sentence was premised on two statutory mitigating factors, RCW 9.94A.535(1)(a), which allowed for a mitigated sentence based on the victim's willing participation in the crime (the willing participant factor), and (e), which allowed for a mitigated sentence based on the significant impairment of the ability to appreciate the wrongfulness of the conduct or to conform conduct to the requirements of the law (the capacity factor). During the sentencing hearing, the State

---

[9] Based on Holt's offender scores of 9+ for each offense, the standard ranges for each count were: (1) 120 months for the conspiracy count, (2) 298 to397 for the first degree human trafficking count, (3) 240 to318 months for the second degree human trafficking count, and (4) 240 to 318 months for the promoting sexual abuse of a minor count.

[10] In his sentencing memorandum, Holt had requested a slightly different sentence on the last two counts, 218 months on the second degree human trafficking count and 180 months on the promoting commercial sexual abuse a of a minor count.

acknowledged both of the mitigating factors that Holt referred to in his sentencing memorandum. But Holt's counsel's argument focused exclusively on the capacity factor without any mention of the willing participant factor.

At the hearing, the State acknowledged that "Holt had a poor upbringing" and "a very difficult childhood, way more so than people that are even in gangs." VRP (June 12, 2020) at 16. But it argued that although this might "explain[ ]" his behavior, it did not "excuse his behavior." *Id.* It asserted that although Holt may have been "impaired, . . . by his birth and by his circumstances," this was not the "type of impairment that would prevent him from understanding right from wrong, from understanding what he was doing, [and] from understanding the impact that this activity . . . [had] on those around him." *Id.* at 18. The State also disagreed that the victims were willing participants in the prostitution scheme.

Without mentioning the willing participant factor, Holt's counsel argued that Holt's terrifying and traumatic childhood had left him with many issues and that mental health issues, learning deficits, the fact male brains do not fully develop until they are around 25, significant failures in the "social safety nets," and systemic racism all contributed to the capacity mitigating factor. *Id.* at 45. Counsel asserted that due to all of these facts, Holt made the choices he made because he had no other choices available to him. Counsel further argued, "And in this case, he was not raised in a situation where he could realistically make the kind of responsible choices that we expect from members of society." *Id.* at 44.

In his statement to the court, Holt described some of his history and diagnoses. He stated that he had been diagnosed with "[l]earning disability, mood disorder, psychotic features, history

of impulse control disorder," as well as post-traumatic stress disorder and personality disorder. *Id.* at 47.

Holt also asserted that he did not force anyone into prostitution because at least one victim was already a prostitute when he met her. But he admitted that he "exploited" the prostitution because he "had the power to say" they were not going to be involved in it. *Id.* at 49-50. Holt also stated that he "underst[oo]d [he] was wrong." *Id.* at 51.

Holt then described being put on work release at some point and attending mental health classes before being arrested on a "warrant for something that happened in 2016." *Id.* And he stated that this was "the first time [he] was given an opportunity in [his] life to do something good," and that he did so by ceasing to be involved in prostitution and drugs and no longer "kicking with [his] homies and doing all that stuff." *Id.* at 51-52. But when he was arrested on the warrant, his "life came crashing back down again." *Id.* at 51.

Holt then mentioned his "impulse control disorder," noting that he was unable to stop himself from interrupting throughout the sentencing proceedings even though he wanted to.[11] *Id.* at 53. He stated that he "just couldn't control [him]self" even though he tried as hard as he could. *Id.* at 54. Finally, Holt stated,

> I'm wrong for what I did. I'm wrong for what I was a part of. I'm wrong for all of it. Now, do I contest certain aspects of it that I believe weren't true? Yes. *But the truth of the matter is, I could have stopped it all*. I could have been the one to stand up and say, "Nah, we ain't doing none of this." And therefore, I'm not better than anyone else.

*Id.* (emphasis added).

---

[11] Holt repeatedly interrupted the State's argument and accused the State of misrepresenting facts and lying. He also interrupted one of the victims who gave statements at the sentencing hearing and accused her of lying.

After hearing from Holt, the trial court ruled,

I'd begin by saying I agree with a great deal of what Mr. Underwood stated in his presentation today. I think that it does make a difference who our parents are. And who surrounds us to provide us with examples and support.

And well, from this record, it's clear that Mr. Holt didn't choose his parents very well. Didn't choose his extended family very well, and he had a very difficult childhood and upbringing and has spent a great deal of his young life both when he was juvenile and as an adult up to this point engaged in illegal behavior.

But at some point -- *at some point, you take responsibility for your actions.* And I also agree to a certain extent with Mr. Underwood on the point of brain development, and we certainly know research on brain development suggests that the brain isn't fully developed until 25 or 26 years of age, and we also know that use of controlled substances or various types of chemicals does affect brain development and the maturation process.

Having said all that, the other thing I would say is that I think that despite your lack of education and despite the upbringing that you had, or lack of good example and family support and all of that, I think Mr. Greer is correct that you are a pretty intelligent person.

And I don't know the extent to which you are able to control or not control your behaviors; I, certainly -- in the years that you have appeared in front of me -- witnessed what would appear to be outbursts and things where I don't know if that was intentional to manipulate the situation, or if it was that you had lacked self-control. I don't know the answer to that.

You said something, when you were speaking a moment ago, that the first time you were given an opportunity to do something good. I believe that every one of us, every day, every moment of every day when we are faced with any decision of any kind, are given the opportunity to do something good.

And I think that, you know, at 28 years of age you have had many opportunities to make a decision on where you were going. I think the difference between you and the others, to the extent that I am aware of it, because all the others aren't here, and by that I mean your co-defendants in this case, right? Is that you were in a leadership position. And I do think that makes a difference.

I think that you have a quality about you where I can see why others are drawn to you. You have the ability to be quite charming. You have been charming in court before. And so I can see why people would be drawn in to you. And then you take that, and you turned it into something very violent and ugly.

19

I think sentencing is about punishment, but I think we also want to have hope that people will change. The difficulty, of course, when you have someone who is very good at manipulation, it's difficult to trust the words that come out of your mouth, and so I don't know how sincere you really are and how committed you really are to having a different path in your life.

Nevertheless, because you are only 28 years of age, I do think that it would be wrong for me not to hope for you and for others that -- whose lives you impact -- that you will, in fact, change, and that you are sincere about your desire to do that, and I would like to give you some opportunity to do that.

*I don't think that this is the case for an exceptional sentence downward*, however. I think you should be sentenced within the standard sentencing range. I believe that, if my memory serves correctly, that the State had amended your charges up significantly, and then the plea agreement was amending them down to the initial charges. So there was already a significant reduction in the sentence you were looking at because of that.

*The State is not recommending high end of the standard sentencing range on Counts II, III, and IV. So the State, again, is giving you some grace and some opportunity for a sentence reduction*.

I think it is a lengthy sentence, and yet I think that the people whose lives you have negatively impacted are going to have to live with that and memories of that and some level of hurt from that and are scarred from that for the rest of their lives. And so for those reasons, I do believe that the recommendation by the State is appropriate, and that's my sentence.

*Id.* at 55-58 (emphasis added).

The trial court then sentenced Holt to 120 months on the conspiracy count, 360 months on the first degree human trafficking count, 286 months on the second degree human trafficking count, and 286 months on the promoting sexual abuse of a minor count.

Holt appeals his convictions and his sentence.

ANALYSIS

Holt argues that the trial court erred when it (1) allowed him to be physically restrained during five pretrial proceedings without first conducting the necessary inquiry, (2) denied him his

right to counsel at a critical stage of the proceedings related to a presentencing motion to withdraw his guilty plea, and (3) denied his request for an exceptional sentence based on two mitigating factors.

## I. RESTRAINTS

Holt first asserts that the trial court erred when it permitted him to be restrained at five of his hearings. He contends that the court failed to engage in the required inquiry before allowing him to appear in restraints at these hearings and that the State cannot establish that the use of these restraints was harmless beyond a reasonable doubt. The five hearings that Holt identifies are: (1) the October 19, 2018 hearing, (2) the November 19, 2018 hearing, (3) the January 25, 2019 hearing, (4) the February 7, 2019 hearing, and (5) the June 24, 2019 hearing.

### A. LEGAL PRINCIPLES

The Sixth and Fourteenth Amendments to the United States Constitution and article I, section 22 of the Washington State Constitution entitle a defendant to appear at trial and at pretrial proceedings without shackles or other restraints, absent extraordinary circumstances. *State v. Jackson*, 195 Wn.2d 841, 852, 467 P.3d 97 (2020). But a court has the discretion to require restraints in court if it first conducts an individualized inquiry into whether the use of restraints is necessary. *Id.* at 852-53.

"A trial court must engage in an individualized inquiry into the use of restraints prior to every court appearance." *Id.* at 854 (emphasis omitted). This inquiry must be " 'founded upon a factual basis set forth in the record.' " *Id.* at 853 (quoting *State v. Hartzog*, 96 Wn.2d 383, 400, 635 P.2d 694 (1981)). The factors the trial court should consider were set out in *Hartzog*,

> "[T]he seriousness of the present charge against the defendant; defendant's temperament and character; [their] age and physical attributes; [their] past record;

past escapes or attempted escapes, and evidence of a present plan to escape; threats to harm others or cause a disturbance; self-destructive tendencies; the risk of mob violence or of attempted revenge by others; the possibility of rescue by other offenders still at large; the size and mood of the audience; the nature and physical security of the courtroom; and the adequacy and availability of alternative remedies."

96 Wn.2d at 400 (first alteration in original) (quoting *State v. Tolley*, 290 N.C. 349, 368, 226 S.E.2d 353 (1976)).

We review a trial court's decision on whether to allow a defendant to appear while in restraints for an abuse of discretion. *Jackson*, 195 Wn.2d at 850. A trial court abuses its discretion when its " 'decision is manifestly unreasonable, or is exercised on untenable grounds, or for untenable reasons.' " *Id.* (internal quotation marks omitted) (quoting *State v. Turner*, 143 Wn.2d 715, 724, 23 P.3d 499 (2001)). A trial court may abuse its discretion by failing to analyze issues under applicable law. *Id.* at 855.

If the trial court has abused its discretion, we must then determine whether the error was harmless. *Id.* at 855-56. In this context, the State bears the burden of proving beyond a reasonable doubt that the constitutional error was harmless. *Id.* at 856.

B. OCTOBER 19, 2018 AND NOVEMBER 19, 2018 HEARINGS

Holt asserts that Judge Arend erred by not conducting individualized inquiries before requiring him to appear in belly chains at the October 19, 2018 and November 19, 2018 hearings. The records from these hearings do not refer to any restraints.

Recognizing that the records from these hearings do not mention any type of restraint, Holt asserts that his statement at the January 25, 2019 hearing, that he was restrained with belly chains at his last five hearings, establishes that he was in belly chains during these two hearings. But our record does not reveal how many hearings occurred between November 19, 2018 and January 25,

2019. And at the June 24, 2019 hearing, Holt's counsel stated that Holt "has been found to not always be required to be in chains." VRP (June 24, 2019) at 8. So the question of whether Holt was in restraints at the October 19, 2018 and November 19, 2018 hearings cannot be resolved simply by relying on the record before us.

In a direct appeal, we do not review matters that rely on evidence outside of the record. *State v. McFarland*, 127 Wn.2d 322, 335, 899 P.2d 1251 (1995). Based on the record before us, Holt fails to show that he was in restraints at the October 19, 2018 and November 19, 2018 hearings. Accordingly, he fails to establish that he was unlawfully restrained at these hearings.[12]

C. JANUARY 25, 2019 HEARING

Holt next argues that Judge Martin erred when she permitted him to be restrained in a restraint chair at the January 25, 2019 hearing without making an individualized determination that restraints were necessary or that a less restrictive alternative to the restraint chair was appropriate. We disagree.

The record shows that the court made an individualized determination before allowing Holt to appear in restraints at this hearing and that it considered whether a less restrictive alternative would be appropriate. The court considered Holt's past violent outbursts in the courtroom toward his codefendant Pinkney, characterizing them as "of a serious nature and unpredictable." VRP (Jan. 25, 2019) at 5. The court also found that Holt posed a threat of harm to himself or others due to his assaultive behavior, although it recognized that this threat of harm was diminishing as more time passed since the August 10, 2018 assault. And the court also considered the fact Holt was

---

[12] If evidence outside of the record demonstrates that he was in restraints at these hearings, Holt can raise this issue in a personal restraint petition. *McFarland*, 127 Wn.2d at 335.

already in arm restraints and a belly chain when he assaulted Pinkney when it determined whether the use of a restraint chair was necessary.

Furthermore, prior to denying Holt and his counsel's requests for reconsideration, the court considered the large number of defendants present, the fact the defendants were in good physical condition and had "gang affiliation[s]," and the fact the courtroom was small. *Id.* at 20. Given the court's consideration of these facts, we hold that it did not abuse its discretion when it allowed Holt to be restrained in a restraint chair at this hearing.

Holt also argues that the trial court failed to address his concern that the court's decision was based on race. Holt raised the issue of whether the court's decision was racially motivated when he was asking the court to reconsider the restraint issue after his counsel had already asked the court to reconsider on other grounds. The court responded by stating that it was "not reconsidering for all of the factors that [it] articulated earlier." *Id.* at 30. Although the court did not expressly state that race did not play a role in its decision, its reference to the factors it did consider responded to Holt's question. Thus, Holt does not show that the court failed to address this concern.

D. FEBRUARY 7, 2019 HEARING

Holt next argues that Judge Arend failed to make an individualized determination before allowing him to appear in restraints at the February 7, 2019 hearing. He asserts that the sole reason the court allowed him to be restrained at this hearing was so the jail could control him and that this is not a proper basis.

At this hearing, the court relied on Judge Martin's January 25, 2019 order allowing restraints, the jail's request for restraints, and a very brief colloquy with the State. Although the State advised the court that Holt had "exhibited violent behavior in court, including an assault on

another in-custody person" and that Holt had been a "problem" for the jail and the court from the beginning, the court did not fully examine these issues and merely stated that it agreed with the State and would not change Judge Martin's order. VRP (Feb. 7, 2019) at 3.

This brief colloquy with the State does not demonstrate that the court made an individualized determination that Holt continued to present the same risk *at this hearing*, where he was the only defendant present, as he did at the hearing before Judge Martin, where he was one of seven defendants. Thus, we hold that the court abused its discretion when it permitted the use of restraints at this hearing without making an individualized determination that they were necessary. Accordingly, we next address whether this error was harmless.

In this context, the State bears the burden of proving beyond a reasonable doubt that the constitutional error was harmless. *Jackson*, 195 Wn.2d at 856. We hold that the State meets this burden here.

Although the court failed to make an adequate individualized inquiry at the February 7, 2019 hearing on Holt's motion to substitute counsel, this was a single hearing on a matter that was repeatedly considered by Judge Arend over the course of these proceedings. Holt also admitted that he had appeared in belly chains at multiple hearings held before the February 7, 2019 hearing. Having repeatedly seen Holt in restraints, we hold that seeing him again in restraints at this single hearing would not have prejudiced the court's decision on his motion to substitute counsel. Nor would this single instance of improper use of restraints have influenced Holt's decision to plead

guilty 11 months later or his sentencing 16 months later. Accordingly, this error was harmless beyond a reasonable doubt, and Holt is not entitled to relief on this basis.[13]

E. JUNE 24, 2019 HEARING

Holt argues that Judge Cuthbertson erred when he allowed Holt to appear in restraints at the June 24, 2019 hearing because the court did not conduct an individualized inquiry into the necessity of the restraints. At the June 24, 2019 hearing, the court discussed but did not rule on the restraint issue because it recused itself. Because the court recused itself from ruling on any of the matters before it, including the restraint issue, Holt does not establish any error.

## II. RIGHT TO COUNSEL ON MOTION TO WITHDRAW GUILTY PLEA

Holt next argues that the trial court denied him his right to counsel when it refused to allow his counsel to withdraw and to appoint substitute counsel to address the CrR 4.2(f) motion to withdraw the guilty plea. We agree.

Defendants are entitled to representation by conflict-free counsel at all critical states of a criminal prosecution, which includes the assistance of counsel at a hearing on a CrR 4.2(f) motion to withdraw a guilty plea. *State v. Robinson*, 153 Wn.2d 689, 694, 107 P.3d 90 (2005); *State v.*

---

[13] We acknowledge that Holt argues that the repeated unlawful use of restraints potentially influenced his decision to plead guilty or prejudiced him with regard to his numerous motions to substitute counsel and his sentencing. Because we hold that only one of the challenged instances of imposing restraints was improper, this single unauthorized appearance in restraints amid the plethora of court hearings was not likely to have influenced any later proceedings.

We also note that some of Holt's arguments regarding prejudice appear to relate to the use of restraints generally, not just the improper use of restraints. While we acknowledge the racial implications of using restraints in criminal proceedings, Holt does not cite any authority requiring this court to consider the impact of the lawful use of restraints in the courtroom. RAP 10.3(a)(6); *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962) (When "no authorities are cited in support of a proposition, the court is not required to search out authorities, but may assume that counsel, after diligent search, has found none.").

*Davis*, 125 Wn. App. 59, 63-64, 104 P.3d 11 (2004). Although counsel is not required if the trial court does not hold a hearing on the motion to withdraw the guilty plea, the record here shows that the trial court heard and considered the motion to withdraw the plea. *See State v. Harell*, 80 Wn. App. 802, 804, 911 P.2d 1034 (1996) (an initial showing on the pleadings that a hearing on a CrR 4.2(f) motion is required before the defendant has a right to counsel).

Although the trial court ultimately stated that it found no basis "for proceeding with a motion to withdraw on a guilty plea," the record belies the conclusion that the trial court did not consider Holt's motion to withdraw his guilty plea. VRP (June 12, 2020) at 15. Instead, the record shows that the trial court did more than determine whether a hearing on the motion was necessary—it fully discussed Holt's allegations and the circumstances leading up to the plea. Thus, Holt's right to counsel to represent him with respect to his motion to withdraw his guilty plea matured.

To establish a violation of the Sixth Amendment and art. I, § 22 based on a conflict of interest, Holt must "demonstrate that an actual conflict of interest adversely affected his [counsel's] performance." *State v. Regan*, 143 Wn. App. 419, 427, 177 P.3d 783 (2008); *State v. Dhaliwal*, 150 Wn.2d 559, 570, 79 P.3d 432 (2003). The mere " 'possibility of a conflict [is] not enough to warrant reversal of a conviction.' " *State v. Kitt*, 9 Wn. App. 2d 235, 243, 442 P.3d 1280 (2019) (emphasis omitted) (alteration in original) (quoting *Dhaliwal*, 150 Wn.2d at 573). Holt need not show prejudice, but he must demonstrate the alleged conflict " 'cause[d] some lapse in representation contrary to [his] interests,' " or that it " 'likely' affected particular aspects of counsel's advocacy on [his (Holt's)] behalf.' " *Kitt*, 9 Wn. App. 2d at 243 (first alteration in original) (internal quotation marks omitted) (quoting *Regan*, 143 Wn. App. at 428).

We review a trial court's denial of a motion to substitute counsel for abuse of discretion. *State v. Stenson*, 132 Wn.2d 668, 733, 940 P.2d 1239 (1997). To determine whether the superior court abused its discretion in denying a defendant's request for substitute counsel, we consider (1) the extent of the alleged conflict, (2) the adequacy of the court's inquiry, and (3) the timeliness of the motion and the effect of any substitution on the scheduled proceedings. *In re Pers. Restraint of Stenson*, 142 Wn.2d 710, 723-24, 16 P.3d 1 (2001); *Stenson*, 132 Wn.2d at 734. Here, all three factors demonstrate that the trial court erred in not granting Holt's motion to substitute counsel on his motion to withdraw his guilty plea.

First, Holt was alleging that counsel's inadequate representation had impacted his decision to plead guilty. In impugning counsel's representation, Holt created a conflict of interest sufficient to affect aspects of counsel's advocacy on Holt's behalf. This was clearly demonstrated by the fact Holt's counsel argued only that he (counsel) should be permitted to withdraw and did not respond to the State's argument against Holt's motion to withdraw his plea.

Second, the court made only a cursory inquiry into this conflict, focusing primarily on the facts related to the validity of the plea. And third, the motion to substitute counsel was timely and would not have caused any delay as it was made the day of the motion to withdraw the guilty plea and Holt's counsel had ensured that substitute counsel was present in the courtroom.

Under these circumstances, the trial court abused its discretion when it failed to grant Holt's motion to substitute counsel for purposes of the motion to withdraw his guilty plea. And because Holt's counsel refused to represent Holt on the motion, Holt was wholly without counsel at this hearing. This type of error "is presumed prejudicial and warrants reversal without a harmless error analysis." *State v. Harell*, 80 Wn. App. 802, 805, 911 P.2d 1034 (1996). Accordingly, we remand

this matter back to the trial court to address Holt's motion to withdraw his guilty plea with new counsel.

### III. SENTENCING

Holt next argues that the trial court erred when it denied his motion for an exceptional sentence below the standard range based on the capacity mitigating factor and the willing participant mitigating factor. We hold that (1) the trial court did not err when it refused to impose an exceptional downward sentence based on the capacity factor, and (2) Holt fails to show that the trial court failed to consider the willing participant factor.

### A. LEGAL PRINCIPLES

A trial court "may impose a sentence outside the standard sentence range for an offense if it finds, considering the purpose of [the Sentencing Reform Act of 1981[14]], that there are substantial and compelling reasons justifying an exceptional sentence." RCW 9.94A.535.[15] Two of the possible factors that a court may use to justify an exceptional sentence below the standard range are, (1) "[t]he defendant's capacity to appreciate the wrongfulness of his or her conduct, or to conform his or her conduct to the requirements of the law, was significantly impaired" in some way other than by the voluntary use of drugs or alcohol, and (2) "[t]o a significant degree, the victim was an initiator, willing participant, aggressor, or provoker of the incident." RCW 9.94A.535(1)(a), (e).

---

[14] Ch. 9.94A RCW.

[15] This statute was amended in 2019. LAWS OF 2019, ch. 210 § 1. Because the amendments did not change any of the relevant portions of this statute, we cite to the current version of the statute.

"While no defendant is entitled to an exceptional sentence below the standard range, every defendant is entitled to ask the trial court to consider such a sentence and to have the alternative actually considered." *State v. Grayson*, 154 Wn.2d 333, 342, 111 P.3d 1183 (2005) (emphasis omitted). "A trial court abuses discretion when 'it refuses categorically to impose an exceptional sentence below the standard range under any circumstances.' " *Id.* (quoting *State v. Garcia-Martinez*, 88 Wn. App. 322, 330, 944 P.2d 1104 (1997)). Additionally, "[w]hen a trial court is called on to make a discretionary sentencing decision, the court must meaningfully consider the request in accordance with the applicable law." *State v. McFarland*, 189 Wn.2d 47, 56, 399 P.3d 1106 (2017). The sentencing court's failure to consider an exceptional sentence authorized by statute is reversible error. *Grayson*, 154 Wn.2d at 342.

B. CAPACITY MITIGATING FACTOR

Holt argues that the trial court's reasoning, that at some point Holt had to take responsibility for his actions, demonstrated "a fundamental misapprehension of the" capacity factor, RCW 9.94A.535(1)(e), and amounted to a categorical refusal to consider this mitigating factor. Br. of Appellant at 54. We disagree.

Holt contends that "[r]ather than conclude [that his] capacity to appreciate the wrongfulness of his conduct was not impaired, the court instead opined, 'at some point, [Holt] need[ed] to take responsibility[for his] action[s],' " and found that "Holt's intelligence rendered him able to appreciate right from wrong." Br. of Appellant at 54 (quoting VRP (June 12, 2020) at 55). He asserts that this approach "demonstrates the court acknowledged Mr. Holt's inability to appreciate the wrongfulness of his conduct, but believed he needed to take responsibility for his actions anyway." *Id.* at 55. And he concludes that under this logic, the court "could never impose

a mitigated sentence based on the other factors listed in the statute (e.g., 'the defendant, with no apparent predisposition to do so, was induced by others to participate in the crime') because 'at some point, [people] need to take responsibility for [their] actions.' " *Id.* (alteration in original) (quoting VRP (June 12, 2020) at 55. He states that this reasoning demonstrates that "as a matter of course" the court "would refuse to grant a mitigated sentence to anyone." *Id.*

We disagree that the court's oral ruling demonstrates a categorical refusal to consider an exceptional sentence or a misapprehension of the capacity factor or a refusal to consider imposing any mitigated sentences. Taken as a whole, the court's discussion of the capacity factor shows that the court fully considered this mitigating factor as it applied to Holt, not in general, and found that it did not apply to him to the extent it would warrant an exceptional sentence below the standard range. In fact, the court stated that it believed the State's recommended sentence already took into account that Holt was entitled to some degree of relief based on his history.

Although the court's reference to Holt needing to take responsibility at some point is strong language, the ruling as a whole shows that the court examined the capacity factor based on Holt's personal attributes and implies that the court found that Holt had the capacity to appreciate the wrongfulness of his conduct. And Holt's own statements to the court support this conclusion because he told the court that he understood that he was wrong, that he could have stopped the prostitution operation, and at some point while he was on work release he was able to "stop[ ] being involved in prostitution." VRP (June 12, 2020) at 52.

Holt further argues that his intelligence should have "no bearing on his ability to appreciate the wrongfulness of his conduct." Br. of Appellant at 55. He contends that the fact he may be intelligent "does not detract from the reality that his upbringing rendered him unable to appreciate

the wrongfulness of his conduct," noting that his psychological evaluation had stated that any child experiencing what he had "would exhibit antisocial behaviors." *Id.* at 56. But the court's reference to his intelligence can be read more broadly as a comment on Holt's ability to understand the nature of his actions. And Holt's own statement that he understood he was wrong and at some point was able to stop his activities is sufficient to show he appreciated the wrongfulness of his conduct.

Accordingly, we hold that the trial court did not abuse its discretion when it declined to impose an exceptional sentence downward based on the capacity factor.

C. WILLING PARTICIPANT MITIGATING FACTOR

Holt further argues that the trial court's failure to refer to the willing participant factor in its oral ruling demonstrated that the court failed to meaningfully consider this factor before rejecting the request for an exceptional sentence. We disagree.

Although Holt's counsel did not argue that the court should consider the victims' willing participation in the crime at the sentencing hearing, counsel briefed this argument in Holt's sentencing memorandum, the State responded to the argument at the sentencing hearing, and Holt presented his own argument about this factor at the sentencing hearing. The trial court's failure to discuss this mitigating factor in its oral ruling does not indicate that the trial court refused to meaningfully consider this proposed mitigating factor. And Holt made no objection to the court's omission of any discussion of this mitigating factor, nor does he now cite any legal authority

requiring the trial court to expressly consider each mitigating factor on the record.[16] RAP 10.3(a(6); *DeHeer v. Seattle Post-Intelligencer*, 60 Wn.2d 122, 126, 372 P.2d 193 (1962).

Accordingly, we affirm Holt's sentence.

## CONCLUSION

We affirm Holt's convictions and sentence. But we remand for a new hearing on Holt's motion to withdraw his guilty plea with the assistance of new counsel.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

---

[16] We note that the willing participant mitigating factor is arguably unavailable with respect to human trafficking and commercial sexual abuse of a minor charges because consent of the victim would negate elements of these offenses. *See* RCW 9A.40.100(1)(a)(i)(A) (requiring the use of fraud, force or coercion); RCW 9A.40.100(3)(a) (requiring use of force, fraud, or coercion or that the victim be under 18); RCW 9.68A.101 (victim must be a minor). Specifically, in human trafficking offenses based on the use of force, fraud, or coercion, a victim's consent would wholly negate the element of force, fraud, or coercion. RCW 9A.40.100(1)(a)(i)(A); RCW 9A.40.100(3)(a). And in human trafficking offenses based on the victim's age and in commercial sexual abuse of a minor, the legislature has elected to treat those under 18 as incapable of consenting to engage in commercial sexual acts. RCW 9A.40.100(3)(a); RCW 9.68A.101.

No. 55171-3-II

CRUSER, J.

We concur:

MAXA, J.

GLASGOW C.J.

34