IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON, | No. 83533-5-I |
| Respondent, | DIVISION ONE |
| v. | UNPUBLISHED OPINION |
| NICOLETTE JACQUELYN STEWART, | |
| Appellant. | |

HAZELRIGG, A.C.J. — The trial court denied in part Nicolette Difillipo's[1] pretrial motion to suppress statements under CrR 3.5, ruling that, while her detention was unlawful, statements she made to police after their discovery of a warrant for her arrest were admissible. She was convicted of possession of a stolen motor vehicle after a jury trial wherein the State relied on those statements

---

[1] The information, judgment and sentence, and other trial documents refer to the defendant as "Nicolette Jacquelyn Stewart" or "Nicolette Stewart." However, the information includes the last name "Difillipo" as an AKA.

Her trial defender procured an order for appeal, and filed her notice of appeal, under the name "Nicolette Difillipo" and that is how the court referred to her at the hearing in question. At oral argument, appellate defense counsel noted his client prefers Difillipo. Wash. Court of Appeals oral argument, State v. Difillipo, No. 83533-5-I (Mar. 2, 2023), at 0 min., 25 sec., video recording by TVW, Washington State's Public Affairs Network, https://tvw.org/video/division-1-court-of-appeals-2023031126/?eventID=2023031126.

Accordingly, we refer to the accused by the name contained in the trial record with which she identifies.

in closing argument. Difillipo assigns error to the portion of the CrR 3.5 ruling denying suppression and further argues it was not harmless beyond a reasonable doubt. We agree on both points and, therefore, reverse the conviction and remand for suppression of the statements.

FACTS

On the morning of June 9, 2019, while driving through Fife, Washington, Jeff Betterley was waved down by two individuals who "looked familiar" and "seemed to be acquaintances from the casino." As the two individuals were stranded, Betterley agreed to take them to their destination, which was not far from his home. Betterley testified that they told him their names were Rick and Nicolette.[2]

Once they arrived at the initial destination, Nicolette Difillipo and Rick Sams were unable to contact their friends; Betterley waited for about 30 minutes, then drove them to Little Creek Casino to see if their friends were there. As they did not find their friends at the casino, Betterley drove them to a trailer park in Chehalis where Difillipo's friend lived. Betterley waited at the park "for quite a while" and eventually went back to his car to relax. Betterley fell asleep in the passenger seat of his vehicle and awoke to Sams driving it down a dirt road. Difillipo was not in the car and Sams explained that he was searching for her. They found Difillipo in the Lucky Eagle Casino parking lot, which was near the trailer park.

_____

[2] At trial, the State showed Betterley a photograph of Difillipo and he identified the person in the photograph as the woman that he picked up in Fife who told him her name was Nicolette. However, as Difillipo was wearing a mask during trial, Betterley could not positively identify her in the courtroom.

Difillipo and Sams began to fight in the parking lot and Sams stormed off, leaving Betterley with Difillipo. Difillipo asked if she could "take a moment in the car" to "compose herself" and Betterley agreed. Betterley gave Difillipo the car key to get into the vehicle, but he kept the key fob so she could not drive it. Betterley later testified at trial that his car, a black 2015 Kia Optima, could only start if the fob was inside the car and, so long as it was, one could simply push the ignition button and the car would start.

Betterley went into the casino and found Sams; Difillipo joined them inside later. Betterley testified that it appeared as if "everything had been resolved." Difillipo said that her friends were only a few minutes away; Betterley was planning to leave, but he went to give his number to someone before departing. When Betterley returned to where he had last seen Difillipo and Sams, they were gone. Betterley then went to the parking garage and discovered that his car was gone as well. He also realized that Difillipo had kept his car key and that the key fob was missing from his pocket. Betterley informed casino security, who called Chehalis tribal police. Betterley provided a statement to police reporting his car was stolen.

A few weeks later, on June 27, Officer Sean Absher of the Snoqualmie Police Department (SPD) observed Sams sitting in the driver's seat of a black Kia Optima parked near the Nike Outlet store in the North Bend Outlet Mall. As the vehicle had tinted windows and no license plate, Absher suspected it may have been stolen. Absher observed Sams exit the vehicle and walk towards the mall until he was out of sight. To assist in his investigation, Absher called for additional officers. He then briefly observed Difillipo walking past the Nike Outlet store alone.

Absher ran the vehicle identification number (VIN) from the Kia and discovered that the car had been reported stolen.

When SPD Sergeant Daniel Moate and Officer Dimitry Vladis[3] arrived on the scene, they contacted Sams and Difillipo while Absher observed from a distance. Vladis separated Difillipo from Sams to speak with her while Moate questioned Sams. Vladis radioed dispatch that both suspects were detained, and Absher later wrote in his report that the subjects were detained at this time. After seizing Difillipo, Vladis testified that he "asked for her name, and ran her name through dispatch." During the detention, Difillipo initially told officers that she was not aware of the Kia and that she was staying at a motel nearby. Officers then received information from dispatch that there was an active warrant for Difillipo's arrest. Shortly after that, officers learned that Department of Licensing (DOL) records showed that the vehicle was registered in her name. At this point, Moate placed Difillipo under arrest and read her Miranda[4] rights.

After the formal arrest on the warrant, Moate confronted Difillipo with the DOL information and asked why she had previously denied any knowledge of the vehicle. In response, Difillipo said that she had purchased the Kia through Craigslist and thought it was at her home in Tacoma, claiming that she was unaware Sams had the vehicle that day. After Betterley gave officers permission to search the Kia, Moate and Vladis found a hand-written bill of sale and release

---

[3] The transcripts appear to contain a repeated error as to this officer's name. The probable cause affidavit, prepared by Absher and attached to the charging document, refers to him as Vladis, as do the excerpts of the Snoqualmie Police Department call logs associated with this incident.

We assume the officer's colleagues and government employer utilize the correct spelling of his name and adopt that spelling.

[4] Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

of interest form, but, on the documents, Betterley's name was misspelled and his purported signature did not match the signature on his vehicle registration.

On September 30, 2019, the State charged Difillipo with one count of possession of a stolen vehicle. On October 29, 2021, Difillipo filed a motion to suppress the statements she made to the officers pursuant to her detention, arguing they were subject to the exclusionary rule as fruit of an unlawful seizure. After the suppression hearing, the trial court granted the motion to suppress in part: "Because Ms. Difillipo's claim that she had no knowledge of the stolen vehicle came during a suspicionless seizure prior to officers discovering a valid warrant for her arrest, this statement is fruit of the poisonous tree and must be suppressed." However, the trial court denied the motion to the extent that Difillipo also sought to suppress her post-Miranda statements: "Ms. Difillipo's subsequent statements came in response to being confronted with information from DOL after officers had arrested her pursuant to a valid arrest warrant. Because this intervening event sufficiently purged the taint of the illegality of her initial detention, her post-arrest statements may be admitted at trial." The court considered the motion under the attenuation doctrine, citing State v Eserjose[5] in its written findings of fact and conclusions of law from the hearing. The case proceeded to trial and the jury convicted Difillipo as charged. Difillipo timely appealed.

---

[5] 171 Wn.2d 907, 259 P.3d 172 (2011)

ANALYSIS

I.    Partial Denial of Motion to Suppress

Difillipo assigns error to the portion of the trial court's decision that admitted her post-arrest statements, and further challenges conclusions of law (CL) 7 and 8 that she contends are inconsistent with our state attenuation doctrine. The State argues the statements are admissible pursuant to the independent source doctrine and asserts that it is "unnecessary to separately analyze attenuation doctrine."[6] Accordingly, we are tasked with reviewing the trial court's conclusions of law, in addition to its ultimate ruling on the evidentiary issue. The defense presented the CrR 3.5 motion to suppress under the framework of attenuation. The trial court decided the matter under that doctrine, expressly citing to Eserjose, so that is the test we will utilize in our consideration of the propriety of that ruling.

When reviewing a suppression ruling, this court accepts the trial court's unchallenged findings of fact as verities. State v. Hill, 123 Wn.2d 641, 644, 870 P.2d 313 (1994). To determine whether those undisputed facts amount to a

_____

[6] The State asserts that, because our review is de novo and we can affirm the ruling on any basis supported by the record, we should consider the independent source doctrine here and apply State v. Rothenberger. 73 Wn.2d 596, 599, 440 P.2d 184 (1968). Under that doctrine, "evidence tainted by unlawful governmental action is not subject to suppression under the exclusionary rule, provided that it ultimately is obtained pursuant to a valid warrant or other lawful means independent of the unlawful action." State v. Gaines, 154 Wn.2d 711, 718, 116 P.3d 993 (2005). Although Rothenberger held an active arrest warrant constituted an independent source, under the particular facts of that case, that allowed for the admission of evidence obtained after an unlawful stop, the case was distinguished in State v. Mayfield and is inapposite here. 192 Wn.2d 871, 889-90, 434 P.3d 58 (2019).
    To the limited extent that Rothenberger was discussed in Mayfield, it was offered as an example of the court holding that "even though official misconduct was arguably a 'but for' cause of the discovery of evidence, the evidence was nevertheless admissible." Id. at 889. To the extent that the State's argument on this issue is premised on the fact that both Rothenberger and Difillipo were ultimately arrested on authority of an existing warrant, as discussed in greater detail later, the express rejection of Utah v. Strieff, 579 U.S. 232, 136 S. Ct. 2056, 195 L. Ed. 2d 400 (2016), in Mayfield makes clear that this is not the determining factor with regard to application of the independent source doctrine over attenuation. Mayfield, 192 Wn.2d at 894.

violation of article I, section 7 of the state constitution, which is a question of law, this court engages in de novo review. State v. Rankin, 151 Wn.2d 689, 694, 92 P.3d 202 (2004). As Difillipo has not assigned error to any finding, we accept the trial court's findings of fact as verities[7] and our review is "limited to a de novo determination of whether the trial court derived proper conclusions of law from those findings." State v. Armenta, 134 Wn.2d 1, 9, 948 P.2d 1280 (1997). Further, given the procedural posture of this appeal, it is axiomatic that we constrain our consideration to only the information available to the court at the time of the CrR 3.5 hearing. See State v. Dunn, 186 Wn. App. 889, 896, 348 P.3d 791 (2015); See also State v. Taylor, 18 Wn. App. 2d 568, 578, 490 P.3d 263 (2021).

The State argues in briefing that this court can determine that the initial detention of Difillipo by SPD was lawful and further provides argument on the Terry[8] standard.[9] However, such an inquiry is beyond the scope of the assignments of error, and the State has not cross appealed the court's CrR 3.5 ruling or any of the accompanying findings of fact and conclusions of law. RAP 10.3(b), (g). Thus, the trial court's determination that Difillipo was unlawfully seized will not be disturbed.[10]

---

[7] In briefing, the State repeatedly relied on testimony from the CrR 3.5 hearing, rather than the unchallenged findings of fact entered by the trial court after its conclusion. We constrain our review to the findings in accordance with well-settled case law.

[8] Terry v. Ohio, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968).

[9] Respondent's Br. at 10-12.

[10] Our conclusion on this matter is further bolstered by the fact that the trial court appears to have reached this ruling in part due to its findings that both Moate and Vladis were not credible in their testimony at the CrR 3.5 hearing about whether Difillipo was detained, as they both contradicted their own reports on that issue. We will not intrude upon a trial court's credibility determinations as they are "for the trier of fact and cannot be reviewed on appeal." State v. Casbeer, 48 Wn. App. 539, 542, 740 P.2d 335 (1987).

"It is well-established that article I, section 7 provides greater protection of privacy rights than the Fourth Amendment." State v. Winterstein, 167 Wn.2d 620, 631, 220 P.3d 1226 (2009). While the Fourth Amendment to the United States Constitution ensures protection against "unreasonable searches and seizures," article I, section 7 of the Washington State Constitution guarantees that "[n]o person shall be disturbed in his private affairs . . . without authority of law." The language of article I, section 7 "constitutes a mandate that the right of privacy shall not be diminished by the judicial gloss of a selectively applied exclusionary remedy." State v. White, 97 Wn.2d 92, 110, 640 P.2d 1061 (1982). Accordingly, under our "constitutionally mandated" exclusionary rule, "'[e]vidence obtained as a result of unreasonable search or seizure must be suppressed.'" Winterstein, 167 Wn.2d at 632-33 (quoting State v. Bonds, 98 Wn.2d 1, 11, 653 P.2d 1024 (1982)).

"Article I, section 7 and its corresponding exclusionary rule provide uniquely heightened privacy protections." Mayfield, 192 Wn.2d at 882. "Unlike its federal counterpart, Washington's exclusionary rule is 'nearly categorical.'" State v. Afana, 169 Wn.2d 169, 180, 233 P.3d 879 (2010) (quoting Winterstein, 167 Wn.2d at 636). Though our exclusionary rule sweeps broadly, it applies to only "fruit of the poisonous tree," i.e., the "evidence obtained as a direct or indirect result of an article I, section 7 violation." Mayfield, 192 Wn.2d at 888-89. However, "determining whether evidence actually is 'fruit of the poisonous tree' cannot always be resolved by simply asking whether the evidence would have been discovered but for the official misconduct." Id. at 889. Rather, "there must be some proximate causal connection between the misconduct and the evidence." Id.

So long as such a connection exists, our exclusionary rule requires suppression of the evidence with "no exception that allows the State to benefit from violations of article I, section 7 by its officers." Id. at 891.

Difillipo assigns error to CL 7 and 8. CL 7 states:

> While a seizure may be unlawful at its outset, it may be subsequently supported by authority of law such that officers may continue to detain an individual despite the initial illegality of their seizure. Moreover, when a confession results following an illegal arrest, courts must analyze whether such a confession was tained [sic] by the initial illegality such that it offends the principles of the poison fruit doctrine. Brown v Illinois, 422 U.S. 590, 95 S. Ct. 2254, 45 L. Ed. 2d 416 (1975). Specifically, where a confession is prompted by an intervening event following an illegal seizure or arrest, it may be said to be sufficiently attenuated from the initial misconduct such as to justify its admission into evidence. State v. Eserjose, 171 Wn.2d 907, 921, 259 P.3d 172, 180 (2011).

CL 8 provides:

> Because Ms. Difillipo's claim that she had no knowledge of the stolen vehicle came during a suspicionless seizure prior to officers discovering a valid warrant for her arrest, this statement is fruit of the poisonous tree and must be suppressed. However, Ms. Difillipo's subsequent statements came in response to being confronted with information from DOL after officers had arrested her pursuant to a valid arrest warrant. Because this intervening event sufficiently purged the taint of the illegality of her initial detention, her post-arrest statements may be admitted at trial.

Difillipo expressly limits her challenge as to CL 8 to only the final two sentences.

A.     Exception to the Exclusionary Rule Based on Attenuation

The attenuation doctrine is implicated "where '[s]ophisticated argument may prove a causal connection between' official misconduct and the discovery of evidence, but the connection was 'so attenuated as to dissipate the taint.'" Mayfield, 192 Wn.2d at 891-92 (quoting Nardone v. United States, 308 U.S. 338,

341, 60 S. Ct. 266, 268, 84 L. Ed. 307 (1939)).[11]  Originally, the federal attenuation doctrine was a "narrow exception to the exclusionary rule requiring a superseding cause for the discovery of evidence."  Mayfield, 192 Wn.2d at 893.  However, the modern federal doctrine no longer requires a superseding cause to break the chain of causation; "intervening circumstances are now sufficient to satisfy the federal attenuation doctrine if official misconduct is not the sole proximate cause of discovering evidence.  Id. at 894.

As our Supreme Court announced in Mayfield, "while the narrow historical version of the federal attenuation doctrine may be compatible with article I, section 7, the broad modern version is not."  Id. at 895.  Rather than wholly abandoning the doctrine, the court adopted a Washington-specific attenuation doctrine:

> We now explicitly adopt a state attenuation doctrine that is satisfied if, and only if, an unforeseeable intervening act genuinely severs the causal connection between official misconduct and the discovery of evidence. If such a superseding cause is present, then the evidence is not properly viewed as 'fruit of the poisonous tree' but, instead, as 'fruit' of the superseding cause. In such a case, the State derives no benefit from its officers' unconstitutional actions. And because a superseding cause must, by definition, be unforeseeable, this narrow attenuation doctrine will not encourage officials to violate article I, section 7 in the hopes of discovering evidence.

Id. at 898.  This doctrine must be "narrowly and carefully applied."  Id.  The burden is on the State to prove that the attenuation doctrine applies and that the challenged evidence is admissible despite the article I, section 7 violation.  Id.  "[T]he State must prove that unforeseen intervening circumstances genuinely severed the causal connection between official misconduct and the discovery of

---

[11] This is different than the independent source doctrine, which exempts evidence discovered through a source "completely independent" of the official misconduct.  Mayfield, 192 Wn.2d at 891-92.

evidence" in order to satisfy its burden. Id. To determine whether intervening circumstances amount to a superseding cause, we engage in a "highly fact-specific inquiry that must account for the totality of the circumstances." Id.

The trial court's findings in Mayfield did not satisfy the Washington attenuation doctrine. Id. at 875. In Mayfield, a deputy responded to a call that Mayfield left his truck in another man's driveway. Id. The deputy contacted Mayfield but did not suspect him of committing any crime, or of being under the influence, or armed or dangerous. Id. at 876. After Mayfield provided his identification, however, the deputy discovered Mayfield had a prior felony conviction, was on supervision by the Department of Corrections, and "had prior contacts in regards to controlled substances." Id. The deputy then inquired about Mayfield's drug use and asked if he could conduct a pat-down search, explaining that Mayfield could refuse. Id. Mayfield consented and the deputy found a bundle of cash on his person that the deputy suspected was "the result of drug transactions." Id. After discovering the cash, the deputy asked if he could search the truck, explaining that Mayfield had the right to refuse; Mayfield consented and the deputy found a substance later determined to be methamphetamine. Id. Mayfield was arrested and charged with possession of a controlled substance with the intent to deliver. Id.

Our Supreme Court held that the deputy illegally seized Mayfield and that the seizure was ongoing when the deputy requested to search him and his vehicle. Id. at 899. Those requests, the court explained, were not unforeseeable intervening circumstances, but part of an intentional drug investigation that was

carried out in the absence of any reasonable, articulable suspicion. Id. Further, the court determined Mayfield's consent to the deputy's requests to search his person and vehicle did not constitute a superseding cause; "consent to search during an ongoing unlawful seizure, even if preceded by Ferrier warnings, is entirely foreseeable and not an independent act of free will." Id. at 901. Accordingly, as there were no intervening circumstances severing the causal connection between the unlawful seizure and the discovery of the challenged evidence, our state attenuation doctrine was inapplicable and the court held that the "evidence must be suppressed." Id. at 901.

Neither the deputy in Mayfield nor the SPD officers here had a reasonable, articulable suspicion that the person they detained had been involved in criminal activity; Difillipo, like Mayfield, was unlawfully seized. That is established by the unchallenged findings of fact, entered pursuant to the CrR 3.5 hearing on suppression, that necessarily included the trial court's credibility determinations of Moate and Vladis, the only witnesses the State presented for testimony. Like the deputy in Mayfield, who was investigating potential drug crimes, the officers here were engaged in an ongoing investigation of a stolen vehicle. Pursuant to that investigation the SPD officers ran the name of a suspect they had illegally detained, Difillipo, and only learned her name because of the illegal detention. During the unlawful seizure, and without the benefit of Miranda warnings, the officers questioned her about her name and connection to the car. When she provided her name, Vladis ran it through dispatch, which is what led to the discovery of the warrant. Difillipo was then arrested under authority of that warrant,

read her Miranda rights, and, only then provided another account of her relationship to the vehicle.

As the facts clearly establish a proximate causal link between Difillipo's unlawful detention and her post-arrest statements, the next question before us is whether "an unforeseeable intervening act genuinely sever[ed] the causal connection." Mayfield, 192 Wn.2d at 898. At oral argument before this court,[12] the State asserted that the superseding cause was the discovery of the DOL information indicating that Difillipo was listed as the registered owner of the Kia.[13] Critically, however, just like the discovery of the arrest warrant, the officers only connected the stolen vehicle to Difillipo via the DOL information through the ongoing unlawful detention during which she provided her name. Mayfield's disavowal of Utah v. Strieff[14] is instructive here.

In Strieff, an officer who was investigating potential drug dealing at a specific home observed Strieff exiting the home, unlawfully seized him, requested his identification, and discovered an active arrest warrant; the officer arrested Strieff on the warrant and discovered drugs on his person during a search incident to arrest. 579 U.S. at 235-36. On review, the United States Supreme Court explained that "the existence of a valid warrant favors finding that the connection between unlawful conduct and the discovery of evidence is 'sufficiently attenuated to dissipate the taint.'" Id. at 240 (quoting Segura v. United States, 468 U.S. 796,

---

[12] Wash. Court of Appeals oral argument, supra, at 16 min., 45 sec.

[13] However, the State also conceded that the information from DOL was received in response to Absher running the VIN. The State elected to proceed with the CrR 3.5 hearing without Absher's testimony so the specifics as to the retrieval of the DOL information are not on the record before us.

[14] Utah v. Strieff, 579 U.S. 232, 136 S. Ct. 2056, 195 L. Ed. 2d 400 (2016).

104 S. Ct. 3380, 82 L. Ed. 2d 599 (1984)). However, Mayfield explicitly denounced this reasoning and explained that application of the federal attenuation doctrine in Strieff "clearly conflicts with our state exclusionary rule by admitting illegally seized evidence and allowing the State to benefit from the unconstitutional actions of its officers." Mayfield, 192 Wn.2d at 894.

As this court applies the narrower state attenuation doctrine, which requires a truly independent and unforeseeable superseding cause to break the chain of causation, Strieff does not control. Difillipo, like Strieff, was unlawfully seized without reasonable articulable suspicion pursuant to a criminal investigation, questioned, and eventually arrested on authority of a warrant. Absent the discovery of her name due to the illegal detention, the officers could not have connected the DOL information to Difillipo in that moment. Neither the discovery of the DOL information nor the arrest warrant was an "unforeseen intervening act [that] genuinely severs the causal connection between official misconduct and the discovery of evidence," particularly as the SPD officers expressly had dispatch run Difillipo's name through databases designed to produce such information. Mayfield, 192 Wn.2d at 898. The unchallenged facts establish that the chain of causation between the unlawful seizure and Difillipo's post-arrest statements was not broken. Mayfield requires suppression; to hold otherwise would allow the the State to "benefit from its officers' unconstitutional actions." Id.

CL 7 cites Eserjose for attenuation, suggesting that was the version of the test the trial court applied. Mayfield supersedes the plurality opinion in Eserjose by providing a refined test for attenuation as decided by a majority of our Supreme

Court. Accordingly, CL 7 is erroneous to the extent it did not apply or follow binding authority. Under the controlling legal standard articulated in Mayfield, the portion of CL 8 addressing the admissibility of Difillipo's statements to police after her arrest on the warrant is also error.

### B. Harmless Error Analysis

When a criminal conviction is at least partially based on unlawfully obtained evidence that should have been suppressed there has been a constitutional error. See State v. Thompson, 151 Wn.2d 793, 808, 92 P.3d 228 (2004). "A constitutional error is harmless if the appellate court is convinced beyond a reasonable doubt that any reasonable jury would have reached the same result, despite the error." State v. Aumick, 126 Wn.2d 422, 430, 894 P.2d 1325 (1995). The State bears the burden of showing the error was harmless. State v. Elwell, 199 Wn.2d 256, 265, 505 P.3d 101 (2022). To determine whether the same verdict would have been reached, this court considers the "untainted evidence admitted at trial to determine if it is so overwhelming that it necessarily leads to a finding of guilt." Thompson, 151 Wn.2d at 808.

Difillipo was charged with one count of possession of a stolen vehicle. The "to convict" instruction provided to the jury required the State to prove beyond a reasonable doubt that "on or about June 27, 2019, [Difillipo] knowingly retained or possessed a stolen motor vehicle." The defense theory at trial was simple: Sams was guilty and Difillipo was innocent. As Difillipo notes in briefing, her entire opening statement was delivered as a first-person narrative from the perspective of Sams. On cross-examination, Moate confirmed that Sams was the only person

officers saw in Betterley's vehicle. In closing argument, Difillipo again pointed the finger at Sams: "He stole the car and he alone is guilty of this crime."[15]

Difillipo then highlighted the fact that, on June 27, 2019, "Difillipo was never seen with the car. She was seen with [Sams] at the mall, but she was never associated with the car." On rebuttal, the State relied heavily on Difillipo's statements: "You have [Difillipo]'s[16] own words to law enforcement that [the car] was supposed to be at her house, that she had got the car from Mr. Betterley, that she had traded heroin for the car with Mr. Betterley." At the conclusion of its rebuttal closing, the State summarized the evidence as follows:

> What you do know is that the title had been transferred to Ms. [Difillipo]. You know that she said that she obtained it. Not Mr. Sams obtained it, but that she obtained it. She gave different versions about how she obtained it, but she said that she was the one who had obtained it and she said that because she believed it to be her vehicle.
>
> Again, the title was transferred to her name. She was in possession of the key at the time the vehicle was stolen, and on June 27th, she said that she had got that car. She said that she had traded heroin for that car and she said that that vehicle was supposed to be at her house in Tacoma, not at Mr. Sam's house.
>
> She didn't say that Mr. Sams had bought the car. She didn't say that Mr. Sams had traded the car for heroin.
>
> Those statements, that testimony, that evidence, shows you that Ms. [Difillipo] retained or possessed the stolen car on that vehicle — that on day [sic], because the car in her mind belonged to her. It was her car that she had obtained.

---

[15] The State only brought a single count of possession of stolen motor vehicle and charged Sams and Difillipo as co-defendants. No allegation of the separate felony theft of a motor vehicle was presented to the jury in this case.

[16] While the parties and the court used the name Difillipo during the CrR 3.5 hearing and other motions heard outside the presence of the jury, jurors were advised as to her AKA and the State referred to the accused as Stewart in closing argument, whereas the defense used Difillipo.

The quoted portions of the record have been modified solely for consistency within this opinion.

In briefing, the State points to the untainted evidence of Betterley's testimony concerning his lengthy encounter with Difillipo and Sams, the forged bill of sale and release of interest documents with Difillipo's name found in Betterley's vehicle, and the information from the DOL showing that Betterley's vehicle was registered in Difillipo's name. This is insufficient to show beyond a reasonable doubt that the error was harmless. Neither Betterley nor the SPD officers testified to seeing Difillipo in possession of the vehicle on the day in question. Although Difillipo's name was found on forged documents inside the vehicle, which was registered in her name, without more, this evidence does not establish beyond a reasonable doubt that Difillipo possessed the vehicle on June 27, 2019. In fact, at oral argument before this court, the State conceded as much when it stated the evidence established that Difillipo was

> involved in the stolen vehicle's possession, not in an actual way, no doubt. She was not in actual possession at the time of this arrest, but there is definitely very conclusive evidence that she was still in constructive possession of the vehicle at that time.[17]

Despite the State's follow-up assertion that the jury was instructed on constructive possession, the trial record is clear that no such instruction was provided. Further, the report of the proceedings establishes that the trial prosecutor did not argue a theory of constructive possession. The State largely relied on Difillipo's inadmissible post-arrest statements during closing argument and we are not "convinced beyond a reasonable doubt that any reasonable jury would have reached the same result, despite the error." Aumick, 126 Wn.2d at 430.

---

[17] Wash. Court of Appeals oral argument, supra, at 19 min., 10 sec.

Because Difillipo's statements obtained as a result of an unlawful seizure were improperly admitted, and the State failed to prove their admission at trial was harmless beyond a reasonable doubt, we reverse and remand for suppression.

Hazelrigg, ACJ

WE CONCUR:

Smith, C.J.          Mann, J.